**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

MANUEL VASQUEZ; MIGUEL
BERNAL LARA; GABRIEL BASTIDA;
RANDY BASTIDA,
*Plaintiffs-Appellees*,

v.

TONY RACKAUCKAS, Orange County
District Attorney, in his official
capacity,
*Defendant-Appellant*,

and

ROBERT GUSTAFSON, Chief of
Police, Orange Police Department, in
his official capacity,
*Defendant*.

No. 11-55795

D.C. No.
8:09-cv-01090-
VBF-RNB

---

MANUEL VASQUEZ; MIGUEL
BERNAL LARA; GABRIEL BASTIDA;
RANDY BASTIDA,
*Plaintiffs-Appellees*,

v.

No. 11-55876

D.C. No.
8:09-cv-01090-
VBF-RNB

ROBERT GUSTAFSON, Chief of
Police, Orange Police Department, in
his official capacity,
            *Defendant-Appellant*,

and

TONY RACKAUCKAS, Orange County
District Attorney, in his official
capacity,
            *Defendant*.

MANUEL VASQUEZ; MIGUEL
BERNAL LARA; GABRIEL BASTIDA;
RANDY BASTIDA,
            *Plaintiffs-Appellees*,

v.

TONY RACKAUCKAS, Orange County
District Attorney, in his official
capacity,
            *Defendant-Appellant*,

and

ROBERT GUSTAFSON, Chief of
Police, Orange Police Department, in
his official capacity,
            *Defendant*.

No. 11-56126

D.C. No.
8:09-cv-01090-
VBF-RNB

MANUEL VASQUEZ; MIGUEL
BERNAL LARA; GABRIEL BASTIDA;
RANDY BASTIDA,
            *Plaintiffs-Appellees*,

                v.

ROBERT GUSTAFSON, Chief of
Police, Orange Police Department, in
his official capacity,
            *Defendant-Appellant*,

              and

TONY RACKAUCKAS, Orange County
District Attorney, in his official
capacity,
                  *Defendant*.

No. 11-56166

D.C. No.
8:09-cv-01090-
VBF-RNB

OPINION

Appeal from the United States District Court
for the Central District of California
Valerie Baker Fairbank, District Judge, Presiding

Argued and Submitted
April 8, 2013—Pasadena, California

Filed November 5, 2013

Before: Marsha S. Berzon, Richard C. Tallman,
and Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Berzon;
Concurrence by Judge Tallman

# SUMMARY[*]

## Civil Rights

The panel affirmed in part and reversed in part the district court's order granting declaratory and injunctive relief to plaintiffs in two class actions which challenged a state court default judgment and injunction obtained by the Orange County District Attorney's Office, on behalf of the State of California, against the Orange Varrio Cypress Criminal Street Gang and its individual members and associates in a state court action to abate gang activity under California's general public nuisance statutes.

The panel first rejected appellees' contention that the district court should have dismissed the suit under *Younger v. Harris*, 401 U.S. 37 (1971), the *Rooker-Feldman* doctrine or under various comity and federalism doctrines.

The panel held that plaintiffs' claim under the procedural due process clause of the California Constitution against defendant Rackauckas, sued in his official capacity as the head of Orange County District Attorney's Office, was barred by *Pennhurst State School & Hosp. v. Alderman*, 465 U.S. 89 (1984). The panel therefore reversed the district court's judgment as to that claim.

The panel held that the scope of the state court injunction was extraordinarily broad, interfering with a wide swath of plaintiffs' protected liberty interests, including: family and

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

social relationships; educational and professional opportunities; freedom of movement; and all manner of participation in civic life. The panel held that in light of those interests, *some* adequate process to determine gang membership was constitutionally required. The panel held that had defendants not voluntarily dismissed the individual plaintiffs from the state court lawsuit before obtaining a default judgment against the Orange Varrio Cypress Criminal Street Gang, that process would have been provided. Because, however, defendants engineered that dismissal, there could not be enforcement against the individual plaintiffs without some alternative adequate process. The panel therefore affirmed the district court's issuance of declaratory and injunctive relief barring enforcement of the state court order against the plaintiffs.

In interpreting the district court's injunction, the panel held that if defendants propose a procedure constitutionally sufficient to determine which members of the plaintiff class are members of Orange Varrio Cypress Criminal Street Gang against whom the Order may be enforced, the district court will consider modifying the federal injunction.

Addressing the district court's award of attorneys' fees in favor of plaintiffs, the panel held that there were "no special circumstances" that made the fee award unjust. The panel held, however, that because defendant Rackauckas was not subject to equitable remedies for violations of state law in this case, it was possible that there was some difference in the amount of the fee award that could be applied to him. The panel left it to the district court in the first instance to determine whether there was some portion of the fee award for which defendant Rackauckas was not responsible.

Concurring, Judge Tallman wrote separately to more thoroughly describe the backdrop of the anti-gang injunction at issue and to reiterate why the panel's holding was confined to the unique procedural and factual record in this case.

## COUNSEL

S. Frank Harrell (argued), Norman J. Watkins, and Melissa D. Culp, Lynberg & Watkins, Orange, California, for Defendant-Appellant Tony Rackauckas.

Wayne W. Winthers (argued), Senior Assistant City Attorney; and David A. De Berry, City Attorney, Orange, California, for Defendant-Appellant Robert Gustafson.

Peter Bibring (argued) and Belinda Escobosa Helzer, ACLU Foundation of Southern California, Santa Ana, California; Joseph J. Ybarra, Jacob S. Kreilkamp, and Laura D. Smolowe, Munger, Tolles & Olson, Los Angeles, California, for Plaintiffs-Appellees.

Dennis J. Herrera, City Attorney; Alex G. Tse, Chief Attorney, Neighborhood and Resident Safety Division; and Jana J. Clark, Deputy City Attorney, San Francisco, California, for Amicus Curiae City and County of San Francisco.

Carmen A. Trutanich, City Attorney; Mary Clare Molidor, Deputy Chief, Criminal & Special Litigation Branch; Anne C. Tremblay, Assistant City Attorney; Kelly Huynh and Jeanne Kim, Deputy City Attorneys, Los Angeles, California, for Amicus Curiae Los Angeles City Attorney's Office.

Matthew Sloan, Matthew Donald Umhofer, and Christina Lincoln, Los Angeles, California, for Amici Curiae Orange County Public Defender, Los Angeles County Public Defender, California Attorneys for Criminal Justice, and California Public Defenders Association.

**OPINION**

BERZON, Circuit Judge:

Since at least 1987, California prosecutors have brought public nuisance actions in state court to curtail the activities of street gangs. *See* Matthew Mickle Werdegar, Note, *Enjoining the Constitution: The Use of Public Nuisance Abatement Injunctions Against Urban Street Gangs*, 51 Stan. L. Rev. 409, 414 (1999). The scope of this effort has been broad. According to amicus curiae Los Angeles City Attorney's Office, that City, for example, has obtained forty-four civil injunctions against seventy-two street gangs in the past two decades. Typically, the injunctions forbid members of the enjoined gang from engaging in a broad swath of legal and illegal activities, individually and with others, in certain areas.

Our question concerns not the substance of such orders but the procedures constitutionally required before individuals denied the opportunity to defend against imposition of the order against them can be subjected to it. Although California courts have grappled for more than twenty-five years with various substantive and procedural issues posed by anti-gang injunctions, no court — either state or federal — has previously addressed the particular due process issue presented here.

The district court approached this case with the utmost care, first denying a preliminary injunction and then, after full discovery, presiding over an eleven-day bench trial. In a comprehensive opinion, the district court concluded that (1) the constitutional issue should be decided, as no applicable abstention doctrine justified declining to do so; and (2) in the particular posture of this case, and given the breadth of the state court injunction at issue, due process requires that the plaintiff class members be afforded an adequate opportunity to contest whether they are active gang members before they are subjected to the injunction. We affirm the district court in principal part.

## I.

California's Street Terrorism Enforcement and Prevention (STEP) Act, *see* Cal. Penal Code §§ 186.20–.33, creates both a private and a public cause of action to "enjoin[], abate[], and prevent[]" a "nuisance" created by a "building or place used by members of a criminal street gang for the purpose of the commission" of various criminal offenses, *see id.* § 186.22a(a). The California Supreme Court has held that the STEP Act's nuisance provision is not the exclusive "remed[y] . . . to abate criminal gang activities," and that the "general public nuisance statutes," namely California Code of Civil Procedure § 731 and California Civil Code §§ 3479–3480, provide independent authority for actions to enjoin a gang and its members from engaging in nuisance activity. *See People ex rel. Gallo v. Acuna*, 14 Cal. 4th 1090, 1119 (1997).

This appeal has its origins in an action to abate gang activity under California's general public nuisance statutes. Our analysis depends in significant part on the procedural

history of the state case. We therefore describe the parties' litigation decisions and the relevant state and federal orders in some detail.

In February 2009, the Orange County District Attorney's Office (OCDA), on behalf of the State of California, filed a public nuisance action in Orange County Superior Court against the Orange Varrio Cypress Criminal Street Gang (OVC) and 115 named individuals. The named individuals were alleged to be "members, agents, servants, employees," or "persons acting under, in concert with, for the benefit of, at the direction of, or in association with" OVC. Of the 115 individual defendants, thirty-two were minors. OCDA further alleged that OVC's "criminal and nuisance activities" included: "attempt[ed] murders, shootings, robberies, assaults, burglaries, felony gang graffiti and the illegal sale of controlled substances"; the use of private residential yards and commercial property as "escape routes" from law enforcement; and "vandalism, loitering, [and] drinking alcohol in public." OCDA sought a permanent injunction restraining OVC and its members from engaging in a broad range of specified activities, lawful and unlawful, joint and individual, performed within a 3.78 square-mile area of the City of Orange. We discuss the scope of the requested relief — which, as we explain, the state court granted in principal part — in greater detail below.

Concurrently with its complaint, OCDA filed an application for a preliminary injunction against all defendants. In support, OCDA filed various exhibits, many under seal.[1] The Superior Court also granted OCDA's ex

---

[1] The Superior Court granted orders prohibiting disclosure of sealed documents to unrepresented defendants.

parte application to serve the complaint on OVC, which had no known address, via a named defendant, Patrick DeHerrera. In addition, OCDA served "numerous individuals named in the state court complaint, including" the current Plaintiffs-Appellees, with the complaint and the unsealed documents in support of the preliminary injunction.

Thirty-two individual defendants filed answers or general denials in the state court action or otherwise formally appeared. Some juvenile defendants and their parents also attempted to file pleadings or enter appearances but were not permitted to do so. The court declined to designate the defendants' parents as guardians ad litem; without an appointed guardian, the juvenile defendants could not appear. *See* Cal. Civ. Proc. Code § 372(a).

The Superior Court granted a preliminary injunction against OVC and the adult individual defendants who had *not* appeared. Soon thereafter, the court issued a preliminary injunction against eighteen adult defendants unrepresented by counsel, including Plaintiffs-Appellees Manuel Vasquez and Gabriel Bastida. The court denied OCDA's motion for a preliminary injunction as to some adult defendants, and continued until May 7, 2009 the hearing as to certain other adult defendants and all juvenile defendants. The court also set a trial date of July 6, 2009.

In advance of the May 7 hearing, some of the adult defendants represented by counsel — including Plaintiff-Appellee Miguel Lara — filed motions opposing the entry of a preliminary injunction against them as individuals. In support, they filed their own declarations; declarations of community members disputing the need for an injunction; and declarations of experts who averred that the OCDA's

evidence, including the Orange Police Department ("OPD") declarations, was insufficient to establish that the named defendants were "active members" of OVC. Through counsel, those defendants also propounded written discovery requests on OCDA; the parties established a schedule for twenty depositions during May and June 2009.

At the May 7 hearing, the state court denied OCDA's preliminary injunction motion as to all unrepresented juvenile defendants on the ground that any injunction would be immediately voidable by those defendants. The court also denied a preliminary injunction as to some adult and juvenile defendants represented by counsel, including Plaintiff-Appellee Randy Bastida, on the ground that there was insufficient evidence of those individuals' "active" participation in the gang. Among the other defendants as to whom the court denied a preliminary injunction for lack of sufficient evidence was Patrick DeHerrera, the person on whom OCDA chose to serve the complaint on behalf of OVC as an entity. The court granted a preliminary injunction as to other defendants, including Plaintiff-Appellee Miguel Lara. As of May 7, OCDA had failed to obtain a preliminary injunction against at least twenty of the defendants originally named in the complaint.

Shortly thereafter, OCDA filed a request to dismiss from the case, without prejudice, sixty-two individual defendants, including the thirty-two adults and juveniles who had filed a general denial or an answer and all unrepresented juvenile defendants. OCDA did so because of the "aggressive effort on the[] part" of those individuals to defend themselves in court, and because of the concerns that the state court judge raised regarding entering a judgment against unrepresented juveniles. The court granted OCDA's dismissal request.

OCDA then requested and obtained a default judgment, including a permanent injunction (the "Order"), against OVC as an entity, including OVC's "members, participants, agents, associates, servants, employees, aiders, and abettors whose membership, participation, agency, association, service, employment, aid, or abetment is more than nominal, passive, inactive, or purely technical, and all persons acting under, in concert with, for the benefit of, at the direction of, or in association with" OVC. The Order names as parties all individual defendants who had not been voluntarily dismissed by OCDA and as to whom the Superior Court had granted a preliminary injunction.[2] We attach a copy of the Order as Exhibit A.

The Order forbids the enjoined parties from engaging in a variety of activities in "any public place, any place accessible to the public, or in public view" within a 3.78 square mile area — the "Safety Zone" — comprising about sixteen percent of the City of Orange.[3] The prohibited activities include both unlawful and otherwise lawful conduct, such as:

• "stand[ing], sit[ting], walk[ing], driv[ing], bicycl[ing]," or "gather[ing] or appear[ing]" with any other enjoined parties, including family members;

---

[2] Among the defaulting defendants was Plaintiff-Appellee Gabriel Bastida, who later had the default judgment against him vacated, filed a general denial, and, as with the others who defended themselves in state court, was subsequently voluntarily dismissed by OCDA.

[3] Except as noted below, *see* nn. 4–5, the Order included the same relief OCDA had originally requested.

• "confront[ing], intimidat[ing], annoy[ing], harass[ing], threat[ening], challeng[ing], provok[ing], assault[ing], or batter[ing]" anyone, or "remain[ing] in the presence of or assist[ing] anyone" the enjoined party knows to be performing such conduct;

• unlawfully using "any drug," or "remain[ing] in the presence of or assist[ing] anyone [the enjoined party] know[s] is unlawfully under the influence of any drug";

• "possess[ing]," "transport[ing]," or "sell[ing]" guns or various other weapons, or "remain[ing] in the presence" of such weapons;

• "us[ing], display[ing], or communicat[ing] by means of any words, phrases, physical gestures, hand signs, or symbols that [the enjoined party] know[s] describe, represent, or refer to the [OVC], or . . . remain[ing] in the presence of or assist[ing] anyone [the enjoined party] know[s]" is performing such conduct;

• "wear[ing], display[ing], exhibit[ing], or possess[ing] any clothes or accessories that [the enjoined party] know[s] . . . refer[s] to the [OVC] gang, including clothes or accessories that display, exhibit, or feature . . . the . . . word[] 'Orange,' . . . the color orange,[4] or . . . remain[ing] in the presence of . . . anyone that [the enjoined party] know[s] is wearing" such clothing;

---

[4] OCDA's original request for injunctive relief included a provision also prohibiting enjoined parties from wearing tan, beige, black, or blue, but the Superior Court limited the prohibited color to orange.

• drinking alcohol; possessing an open container of alcohol; or knowingly remaining in the presence of a person drinking or possessing such an open container, without exception for a person eating or working in a restaurant;**[5]**

• for minors, being in a "public place, vacant lot, or business establishment" between 10pm and 5am *unless*: (1) accompanied by a parent, legal guardian, or responsible adult; (2) on an errand at the direction of a parent or guardian; (3) on a sidewalk in front of or adjacent to the minor's dwelling; (4) in, or en route to or from, a "place of lawful entertainment, recreation, culture, or charity" during that place's operating hours, or in or en route to or from lawful employment or volunteer activity; (5) en route to or from, or engaged in, "an official school, official religious, or other expressive activity within the scope of [one's] rights under the First Amendment," where such activity is "supervised or overseen by an adult person on behalf of" a civic organization; (6) responding to an emergency situation; or (7) "in a vehicle engaged in interstate travel";

• for adults, being in a "public place, vacant lot, or business establishment" between 10pm and 5am *unless*: (1) on a sidewalk in front of or adjacent to the person's dwelling; (2) in, or en route to or from, a "place of lawful entertainment, recreation, culture, or charity" during that

---

**[5]** Unlike the other provisions, the prohibitions related to alcohol only extend to such conduct "in any public place" or "any place accessible to the public," but not to such conduct carried out "in public view." The Superior Court struck the "public view" language from the OCDA's requested prohibitions on alcohol, concerned that such a broad provision would prohibit a person from consuming alcohol in his own home if adjacent to a window. The Superior Court did not so limit the reach of any of the other provisions, including the restrictions on association.

place's operating hours, or in, or en route to or from, lawful employment or volunteer activity; (3) en route to or from, or engaged in, "an official school, official religious, or other expressive activity within the scope of [one's] rights under the First Amendment"; (4) responding to an emergency situation; or (5) "in a vehicle engaged in interstate travel."

As noted, the Order applies not only to the named parties, but also to OVC's "members," without regard to whether such individuals were acting on behalf of OVC or, except as specified in the Order, with other OVC members, when engaged in proscribed activities. The Order does not provide any procedures for the parties or the Superior Court to determine which, if any, unnamed parties were "members" of OVC and therefore subject to the Order's terms. The Order has no expiration date.

A few weeks after default entry of judgment, the OPD, at OCDA's instruction, began serving the Order not only on the individual defendants against whom the injunction had issued, but also on individuals originally named as defendants in the state court case but voluntarily dismissed by OCDA. By September 2009, OCDA and OPD had served at least forty-eight individuals who had been named in the nuisance suit against OVC but whom OCDA voluntarily dismissed.

Along with the Order, OCDA and OPD served the following "Notice":

> YOU ARE HEREBY PUT ON NOTICE THAT ON MAY 14, 2009, JUDGE KAZUHARU MAKINO SIGNED AN ORDER FOR PERMANENT INJUNCTION

AGAINST THE ORANGE VARRIO CYPRESS CRIMINAL STREET GANG.

ALL MEMBERS OF THE GANG ARE SUBJECT TO THE TERMS OF THE PERMANENT INJUNCTION.

ALL MEMBERS OF THE GANG, WHETHER OR NOT NAMED IN THE ORIGINAL LAWSUIT . . . AND LATER DISMISSED FROM THE LAWSUIT . . . ARE SUBJECT TO THE TERMS OF THE PERMANENT GANG INJUNCTION. . . .

*ALL PERSONS DESCRIBED ABOVE WILL FACE CRIMINAL PROSECUTION PURSUANT TO PENAL CODE SECTION 166(a)(4) FOR ANY WILLFUL VIOLATION OF ANY PROVISION LISTED IN THE PERMANENT GANG INJUNCTION.*

The Superior Court had no role in reviewing or approving the notice.

About four months after entry of the Order, four individuals on whom OCDA and OPD served the Order and Notice filed this action under 42 U.S.C. § 1983 against the heads of OCDA and OPD — District Attorney Tony Rackauckas and Chief of Police Robert Gustafson — in their official capacities (collectively "Orange"). Alleging that OCDA and OPD's "dismiss-and-serve strategy" violated the procedural due process clauses of the U.S. and California constitutions, Plaintiffs sought a declaration of the unconstitutionality of Orange's conduct and an injunction

barring Orange from enforcing the Order against Plaintiffs "without first providing them with a full constitutionally[] adequate hearing." Plaintiffs presented no challenge to the terms of the Order; they challenged only the adequacy of their opportunity to contest the application of the Order to them.

The four named Plaintiffs sought to represent two classes: (1) adults and minors "named as individual defendants" in the state case, "who appeared . . . in the Orange County Superior Court to defend themselves and were voluntarily dismissed by [OCDA]," and (2) minors "named as individual defendants" in the state case for whom no guardian ad litem was appointed and who were voluntarily dismissed by OCDA. The proposed class definitions excluded any individuals who were already being prosecuted for state criminal contempt proceedings for violating the Order.[6]

The district court denied Plaintiffs' motion for a preliminary injunction; granted Plaintiffs' motion to certify both classes; and denied the parties' cross motions for summary judgment. The district court then held an eleven-day bench trial, hearing testimony from fourteen witnesses, receiving more than 100 exhibits, and personally touring the area of the City of Orange covered by the Order. The court concluded that "Defendants deprived the Plaintiffs and those similarly situated of their constitutionally protected liberty or property interests without adequate procedural protections." The court also granted "an injunction barring Defendants from enforcing the Order against the Plaintiffs." The court emphasized that it was "*not instructing the state court as to*

---

[6] The record does not reflect whether, at the time Plaintiffs filed suit, OCDA had in fact commenced contempt proceedings against anyone not individually named in the Order.

*the nature of any hearing*. . . . [T]he Court's order [is] directed to the Defendants, and not the state court." (emphasis in the original).

Orange timely appealed to this court.

## II.

Before turning to the merits of the due process claim, we address Orange's contentions that under various comity and federalism doctrines, the district court should have dismissed this suit rather than deciding the issue raised and granting equitable relief.

## A.

Orange maintains, first, that the suit should have been dismissed under the doctrine established in *Younger v. Harris*, 401 U.S. 37 (1971), limiting federal courts' authority to enjoin ongoing state court proceedings in some instances. "In addressing *Younger* abstention issues, district courts must exercise jurisdiction except when specific legal standards are met, and may not exercise jurisdiction when those standards are met; there is no discretion vested in the district courts to do otherwise." *San Jose Silicon Valley Chamber of Commerce Political Action Comm. v. City of San Jose*, 546 F.3d 1087, 1092 (9th Cir. 2008) (alteration omitted). We review de novo a district court's determination as to whether *Younger* abstention is warranted. *See Gilbertson v. Albright*, 381 F.3d 965, 982 n.19 (9th Cir. 2004) (en banc).

As relevant here, "usually, federal plaintiffs who are not also parties to pending litigation in state court may proceed with their federal litigation" without being barred under

*Younger*. *Green v. City of Tucson*, 255 F.3d 1086, 1099 (9th Cir. 2001) (en banc), *overruled on other grounds*, *Gilbertson v. Albright*, 381 F.3d 965 (9th Cir. 2005). Only under "quite limited circumstances" may *Younger* "oust a district court of jurisdiction over a case where the plaintiff is not a party to an ongoing state proceeding." *Id.* at 1100. Such circumstances are present only when a federal plaintiff's interests are "so intertwined with those of the state court party that . . . interference with the state court proceeding is inevitable." *Id.*

The district court properly declined to abstain under *Younger*. OCDA initially named Plaintiffs as parties in the Superior Court action but unilaterally dismissed them. OCDA did so precisely because of Plaintiffs' "effort . . . to fight" — that is, to present a defense in state court. "*Younger* abstention cannot apply to one . . . who is a stranger to the state proceeding." *Id.* at 1103 (quoting *Gottfried v. Med. Planning Servs. Inc.*, 142 F.3d 326, 329 (6th Cir. 1998)). Orange made Plaintiffs "stranger[s]" to the state case by denying them an opportunity to be heard in state court on the question whether they were gang members. *Id.*

Moreover, as parties dismissed from the state case, Plaintiffs' interests are not "intertwined" with those against whom the Order was issued, namely, OVC and the remaining, named defendants. *Id.* at 1100. The question Plaintiffs raise in this case — the adequacy of OCDA's and OPD's gang-membership determination — arose precisely because Plaintiffs were *dismissed* from the state court litigation and so could not defend against the imposition of an injunction on them in that litigation. Those covered by name by the Order did not attempt to present a defense and were not dismissed from the litigation. The circumstances and interests of those

covered by name in the Order and the Plaintiffs are therefore entirely divergent as to the procedural issues raised here.

In addition, the relief sought in federal court would not disturb the validity of the Order as to any of the parties against whom it issued. Plaintiffs do not challenge the terms of the Order. There is therefore nothing about Plaintiffs' interests that is currently "intertwined" with those of the named state defendants against whom the injunction issued.

## B.

Orange's next federalism-related contention is that Plaintiffs' action is a "de facto appeal" of the Superior Court Order, barred by the *Rooker-Feldman* doctrine. *See D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923). We review de novo the district court's decision that *Rooker-Feldman* does not bar Plaintiffs' action. *See Bell v. City of Boise*, 709 F.3d 890, 896 (9th Cir. 2013).

As this court recently reiterated, the "de facto appeals" barred by *Rooker-Feldman* are those in which "a federal plaintiff asserts as a legal wrong an allegedly erroneous decision *by a state court*." *Id.* at 897 (quoting *Noel v. Hall*, 341 F.3d 1148, 1164 (9th Cir. 2003)) (emphasis added). "In contrast, if 'a federal plaintiff asserts as a legal wrong an allegedly illegal *act or omission by an adverse party*, *Rooker-Feldman* does not bar jurisdiction.'" *Id.* (quoting *Noel*, 341 F.3d at 1164) (emphasis added). "[E]ven if a plaintiff seeks relief from a state court judgment, such a suit is a forbidden de facto appeal only if the plaintiff *also* alleges a legal error by the state court." *Id.*

Here, Plaintiffs "assert[] as a legal wrong" only OCDA and OPD's allegedly unconstitutional enforcement of the Order. *See id.* at 897. They present no challenge to the terms of the Order, nor do they otherwise "allege[] a legal error" by the Superior Court. *See id.* Plaintiffs' suit is therefore "not a forbidden de facto appeal" under *Rooker-Feldman*. *See id*.

## C.

Orange also asserts that the district court should have abstained from hearing Plaintiffs' case under more general principles of comity, equity, and federalism, unmoored from any particular abstention doctrine heretofore endorsed by the Supreme Court or our court. We review for abuse of discretion the district court's decision not to abstain under doctrines other than *Younger*. *See United States v. Hinkson*, 585 F.3d 1247, 1263 n.23 (9th Cir. 2009) (en banc); *Green*, 255 F.3d at 1092–93 & n.10.

Orange's argument hinges on three out-of-circuit cases somewhat similar to this one but, in other respects, significantly different. In each of those cases, the federal court plaintiffs sought to enjoin prosecutors from enforcing state-court-issued injunctions against individuals not named in the state injunctions. In each case, the district court abstained from issuing the requested injunction, and the court of appeals affirmed the abstention. *See Gottfried*, 142 F.3d at 330–33; *McKusick v. City of Melbourne*, 96 F.3d 478, 487–89 (11th Cir. 1996); *Hoover v. Wagner*, 47 F.3d 845, 850–52 (7th Cir. 1995).

In the case before us, the district court initially relied on these out-of-circuit authorities in denying Plaintiffs' request for a preliminary injunction. At that point, Plaintiffs were

seeking an expansive injunction that would have required "judicial hearings[s]," with specific, prescribed procedural protections, before OPD and OCDA could enforce the Order against them. The district court concluded that such relief "would result . . . in an inappropriate invocation of the equity powers of the federal court," because the remedy would require the involvement of a state judicial officer.

After Plaintiffs "clarified and narrowed" the injunctive relief sought, and after trial, the district court issued a permanent injunction against Orange, simply barring it "from enforcing the Order against the Plaintiffs." In so doing, the court emphasized that it was "*not instructing the state court as to the nature of any hearing.*"

We need not address whether the district court would have abused its discretion in denying an injunction along the lines originally sought by Plaintiffs. Nor need we decide whether *Gottfried*, *McKusick*, and *Hoover* properly state the contours of an abstention doctrine that a district court might follow under circumstances not present here. We do hold that in the posture of this case, the district court did not abuse its discretion in declining to abstain from granting declaratory and injunctive relief after trial.

First, and most important, in the out-of-circuit cases, the plaintiffs challenged the terms of the state injunction. Not so here. Instead, Plaintiffs challenge only Orange's policy of enforcing the Order against them, given that they were dismissed from the state case and so deprived of that

opportunity to adjudicate their membership in OVC before being subjected to the Order.**[7]**

Second, the Plaintiffs here have neither sued the state judge who issued the relevant injunction, nor sought any relief from the state court. Instead, they seek to enjoin only the police and prosecutors whom the district court found, after trial, to have a policy of enforcing the Order against the same class of people dismissed from the state case. *Cf. Gottfried*, 142 F.3d at 328 (injunction sought against state judge); *Hoover*, 47 F.3d at 846, 851 (same).

Third, as we construe the district court's order, *see infra* Section V, the federal relief granted does not pose an undue risk of "thrust[ing] the federal court  into an unseemly, repetitive, quasi-systematic, supervisory role over administration of the state court injunction." *McKusick*, 96 F.3d at 488. OCDA and OPD retain the broad discretion to enforce the Order, including against Plaintiffs, provided they provide the process guaranteed by the U.S. Constitution. *See infra* Section V.**[8]**  Nor was the relief the district court

---

**[7]** In *Gottfried*, for example, the plaintiff's requested injunction against enforcement of the state order was premised on her First Amendment challenge to the terms of the order, *see* 142 F.3d at 328, 330–31; in *McKusick*, the plaintiff argued that the state court injunction "authorize[d] arrests without probable cause," *see* 96 F.3d at 487; and in *Hoover*, the plaintiff argued that the injunction was "vague and overbroad" and "infringe[d]" on First Amendment rights, *see* 47 F.3d at 846.

**[8]** *E.T. v. Cantil-Sakauye*, 682 F.3d 1121 (9th Cir. 2011) (per curiam), *cert. denied*, 133 S. Ct. 476 (2012), on which Orange relies heavily in its reply brief, is inapposite. In *E.T.*, the dispositive ground for abstention was the specter of federal supervision of state *judicial* proceedings. The district court here made clear that its injunction does not run against state judges, state courts, or state court administrators.

granted based on "nebulous and speculative . . . fears" that the Order would be enforced against them. *Hoover*, 47 F.3d at 851. As we discuss in Section IV.A, the district court's decision was based on particularized evidence introduced at trial that Orange has sought to enforce the state Order against the entirety of the Plaintiff class. *See Wooley v. Maynard*, 430 U.S. 705, 710 (1977) (upholding an injunction against a state prosecution "when a genuine threat of prosecution exist[ed]"); *Steffel v. Thompson*, 415 U.S. 452, 475 (1974) (holding that "federal declaratory relief is not precluded when no state prosecution is pending and a federal plaintiff demonstrates a genuine threat of enforcement").

These distinctions matter because they eliminate the danger of an "affront to comity." *See Hoover*, 47 F.3d at 851. Issuing equitable relief against OCDA and OPD does not create a conflict with any decision by the state court, nor does it preemptively decide any question the state court may be called upon to address in any pending proceeding of which we are aware. *Cf. Gilbertson*, 381 F.3d at 980 n.14 (noting that *Younger* abstention is inappropriate where a federal claim is "wholly unrelated" "to the issues in [a] pending state proceeding").

Orange nonetheless vigorously asserts that the federal court's injunction leaves them "caught between conflicting orders." That is simply not so. Orange fundamentally misreads the state court's Order.

Nothing in that Order authorizes the police or district attorney to subject Plaintiffs to that Order, much less *requires* them to enforce the Order against the individual Plaintiffs in this case without further procedural protections. Indeed, the Order does not require that its provisions be *enforced* against

anyone.  And nothing in it states what procedures Orange should use to determine which unnamed parties are covered by the Order or against which such parties the Order should be enforced.[9]

*People ex rel. Totten v. Colonia Chiques*, 156 Cal. App. 4th 31 (2007), does not change our understanding of the state court Order.  That case held that a trial court could *enter* an injunction against a gang and its "active members," without any individuals being named as parties in the case.  *See id.* at 39–43.  The court reasoned that:

> it is simply not practical to require [the State] to name Colonia[] Chiques gang members individually as defendants.  There are approximately 1,000 members, and membership is continually changing.  New members are joining the gang, while old members are leaving it or becoming inactive.  If the gang could not be sued, [the State] would have to bring a new action for injunctive relief against each new member.  The Legislature surely did not intend to impose such an onerous burden on officials

---

[9] The Superior Court's comments before granting OCDA's motion for default judgment against OVC as an entity confirm that the Order is silent as to procedures for enforcement.  The court explained that it viewed the issue whether OCDA might serve the Order on the now-federal-Plaintiffs "without some sort of judicial process" as an "enforcement issue" not before the court.  When counsel for some of the current Plaintiffs requested "that if there were some circumstance where the District Attorney attempts to serve our clients, that they be subject to some judicial review of that," the court responded: "That may be, but that's nothing I need to decide now.  Hopefully I'm not even going to hear that."

> who are trying to mitigate California's "state
> of crisis which has been caused by violent
> street gangs."

*Id.* at 41 (quoting Cal. Penal Code § 186.21). *Colonia Chiques* supports Orange's position that under California law, it was not required to name all of a gang's active members as parties to obtain an injunction against the gang.[10] But nothing in either *Colonia Chiques* or the state proceedings that preceded this case addressed the separate question of what process is due before a non-party individual can be subjected to an injunction as a purported member of an enjoined gang.

We note finally that the fact that the equitable relief sought by nonparties to a state-court proceeding bears some relationship to that state proceeding would not be a sufficient basis for a district court to abstain from deciding a federal constitutional question. As we explained in *Green*,

> The principle that § 1983 plaintiffs need not
> exhaust available state judicial or
> administrative remedies necessarily means . . .
> that the mere availability of a state judicial
> proceeding that allows the opportunity to
> vindicate federal rights is insufficient to
> justify abstention under *Younger*. . . . There is
> no principled difference, with regard to the
> comity principles underlying *Younger*,
> between requiring a plaintiff to begin his or

---

[10] Another California Court of Appeal has reached the opposite conclusion. *See People ex rel. Reisig v. Broderick Boys*, 149 Cal. App. 4th 1506, 1522 (2007). We express no view as to which California court is correct on this point.

her own state court or administrative proceeding when that is possible and requiring the plaintiff to intervene in someone else's state court suit when that is possible. Either way, the requirement is inconsistent with the longstanding principle that § 1983 plaintiffs can ordinarily go forward in federal court if they choose to do so, and need not bring their cause to state court first.

*Green*, 255 F.3d at 1102. That rule is especially apt here, as any comity concerns are largely of OCDA's own making.

In short, under the circumstances of this case, the district court did not abuse its discretion in declining to abstain from granting relief under general principles of comity and federalism.

### D.

Orange's final comity-related contention is that the district court erred under a line of cases originating with *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491 (1942), by "accepting jurisdiction" over Plaintiffs' action, which included a claim for a declaratory judgment. The argument is twofold: first, that the district court was obliged under *Brillhart* to state its reasons for exercising its discretion to consider Plaintiffs' claim for declaratory relief but did not do so; second — and closely related — that even assuming the district court had adequately stated its reasons, its decision to

entertain Plaintiffs' declaratory relief claim was an abuse of discretion under *Brillhart*.**[11]**

Orange's first contention relies on *Dizol*, 133 F.3d at 1225, which held that when "a party timely objects to [a district court's] exercise of discretionary jurisdiction under the Declaratory Judgment Act," and the district court fails to "make a sufficient record of its reasoning" to "exercise . . . jurisdiction," "the case must be remanded to the district court to record its reasoning in a manner sufficient to permit the 'proper application of the abuse of discretion standard on appellate review.'" *Id.* (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 289 (1995)).**[12]**

---

**[11]** We reject Plaintiffs' contention that Orange forfeited its *Brillhart* argument by not raising it earlier. A *Brillhart*-based objection "may not be raised for the first time on appeal." *See Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998) (en banc). But Orange timely raised the issue in the district court by making the argument in its Objections to Plaintiffs' Proposed Additional Findings of Fact and Conclusions of Law and Proposed Judgment and proposing specific language that the district court could include in declining to issue a declaratory judgment. The *Brillhart* issue was therefore "raised sufficiently for the [district] court to rule on it," and so not forfeited. *See Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006).

**[12]** *Countrywide Home Loans, Inc. v. Mortgage Guar. Ins. Corp.*, 642 F.3d 849 (9th Cir. 2011) clarified that the language in *Dizol* and related cases referring to a district court's "exercise" or "accept[ance]" of "discretionary jurisdiction" "in an action seeking declaratory relief" is "imprecise." *Id.* at 852 (internal quotation marks omitted). That is so because the Declaratory Judgment Act "does not confer jurisdiction, and therefore also does not afford the opportunity to decline it." *Id.* at 853. The relevant discretion vested in a district court is whether "*to provide a declaratory remedy* pursuant to its otherwise proper subject matter jurisdiction over a dispute." *Id.* (emphasis added).

*Dizol*'s bright-line remand rule "does not apply to claims that exist independent of the request for a declaration." *Scotts Co. LLC v. Seeds, Inc.*, 688 F.3d 1154, 1158 (9th Cir. 2012) (internal quotation marks and alteration omitted). "[A] claim is independent" in this context "if it would continue to exist if the request for a declaration simply dropped from the case." *Id.* Orange acknowledges this standard but argues that it is not satisfied here, on the theory that Plaintiffs' claim for injunctive relief is predicated on an "initial declaration that Plaintiffs have suffered a violation of their constitutional rights."

We disagree. Plaintiffs' claim for injunctive relief "is independent because it would be viable without the declaratory claim." *See id.* at 1159. *Scotts*, for example, held that a claim for specific performance of a contract — which is, essentially, an injunction[13] — was "independent" of a claim for declaratory relief "because it would be viable without the declaratory claim." *Scotts*, 688 F.3d at 1159. Other circuits have similarly rejected the argument that a request for an injunction is "merely 'ancillary'" to a request for declaratory relief. *See Black Sea Inv., Ltd. v. United Heritage Corp.*, 204 F.3d 647, 652 (5th Cir. 2000); *Chase Brexton Health Servs., Inc. v. Maryland*, 411 F.3d 457, 466 (4th Cir. 2005).

---

Understood in light of *Countrywide*, then, Orange's first contention is that the district court's *grant* of declaratory relief, over Orange's objection based on the *Brillhart* factors, and without reasoned consideration of that objection, requires us to vacate and remand.

[13] *See Ariz. Edison Co. v. S. Sierras Power Co.*, 17 F.2d 739, 740 (9th Cir. 1927); 4 S. Symons, Pomeroy's Equity Jurisprudence § 1341, at 941 (5th ed. 1941).

Because *Dizol*'s discretionary rule does not apply, we proceed to consider Orange's second *Dizol*-related argument, namely, that the district court abused its discretion in entertaining Plaintiffs' claim for declaratory relief in light of the related state court proceedings. Because the declaratory judgment claim was "related" to the "independent non-declaratory judgment claim" —  for injunctive relief — we "evaluate[] under the *Colorado River* doctrine," rather than under *Brillhart*, the district court's discretionary decision to grant relief. *See Scotts*, 688 F.3d at 1158–59.

"Under *Colorado River*, considerations of 'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation,' may justify a decision by the district court to stay federal proceedings pending the resolution of concurrent state court proceedings involving the same matter[.]" *Holder v. Holder*, 305 F.3d 854, 867 (9th Cir. 2002) (citations omitted). Here, as the district court recognized, "there is no ongoing state proceeding" that could "provide" Plaintiffs "relief" on their due process claim. *Id.* at 868. As there are no "concurrent" "state proceedings" that "will resolve" Plaintiffs' claims, *id*. at 870, the *Colorado River* doctrine does not apply. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 12 F.3d 908, 913 (9th Cir. 1993). The district court therefore did not abuse its discretion in carrying out its "virtually unflagging obligation . . . to exercise . . . jurisdiction," and to grant declaratory relief, rather than staying Plaintiffs' action under *Colorado River*. *See Gilbertson*, 381 F.3d at 982 n.17.[14]

---

[14] Because we reject Orange's *Brillhart*-related argument on the foregoing grounds, we need not address the parties' dispute over whether *Brillhart* and its progeny set limits on a district court's discretion to grant a declaration as to the parties' rights under federal law where, as here, the

## III.

The final issue we must consider before addressing the merits of Plaintiffs' due process claim is a narrow one. Defendant Rackauckas, sued in his official capacity as the head of OCDA, argues that Plaintiffs' claim against him under the procedural due process clause of the California Constitution is barred by *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89 (1984). We agree.

"A federal court[]" may not "grant" injunctive "relief against state officials on the basis of state law," when those officials are sued in their official capacity. *Pennhurst*, 465 U.S. at 106; *see Pena v. Gardner*, 976 F.2d 469, 473 (9th Cir. 1992) (per curiam). For purposes of § 1983 liability, whether a California "county district attorney acts as a state" rather than local "official" depends on the particular acts challenged in the § 1983 suit. *See Weiner v. San Diego Cnty.*, 210 F.3d 1025, 1030 (9th Cir. 2000). A "California district attorney is a state officer when deciding whether to prosecute an individual," and when "investigating and proceeding with criminal prosecutions." *Id*. at 1030–31; *accord Goldstein v. City of Long Beach*, 715 F.3d 750, 753–62 (9th Cir. 2013). Plaintiffs' allegations — all of which attack OCDA's policies for enforcing the state Order against Plaintiffs through criminal contempt proceedings — fall squarely within that category of state, rather than local, official action. *Weiner*, 210 F.3d at 1030–31. Given the particular official conduct at issue, Plaintiffs cannot seek injunctive relief in federal court against Rackauckas for alleged violations of the California Constitution. We accordingly reverse the district court's

district court had federal question jurisdiction as opposed to diversity jurisdiction.

judgment against Rackauckas on Plaintiffs' second claim for relief. *See Pennhurst*, 465 U.S. at 106; *Weiner*, 210 F.3d at 1030–31.

*Pennhurst*, of course, has no bearing on Rackauckas's amenability to suit in federal court for alleged violations of federal law. The district court determined that Plaintiffs were entitled to relief under the federal Constitution before proceeding to address their claims under the California Constitution, and awarded the same declaratory and injunctive relief on each independent ground. Rackauckas's state-law immunity argument does not impact our analysis of Plaintiffs' federal due process claim or the corresponding relief granted, to which we turn.[15]

## IV.

The district court's grant of declaratory and injunctive relief was based on its conclusion that "by subjecting Plaintiffs and those similarly situated . . . to the enforcement of the Order," Orange "deprived Plaintiffs and those similarly situated" of their "constitutionally protected liberty interests without adequate procedural protections." Reviewing the factual findings underlying the district court's analysis for clear error and the district court's legal conclusions regarding the due process claim de novo, we affirm the district court. *See Hinkson*, 585 F.3d at 1260; *Ting v. AT&T*, 319 F.3d 1126, 1135 (9th Cir. 2003).

"We analyze a procedural due process claim in two steps. The first asks whether there exists a liberty or property

---

[15] We address in Section VI *infra* the relevance of the *Pennhurst* issue to the fee award.

interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *United States v. Juvenile Male*, 670 F.3d 999, 1013 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 234 (2012) (internal quotation marks and alteration omitted).

## A.

As to the first step of the procedural due process analysis, we agree with the district court that the Order profoundly implicates liberty interests protected by the Due Process Clause, including rights of free movement, association, and speech, and that Orange's conduct interferes with those protected liberty interests of the Plaintiffs.

"Freedom of speech and the other freedoms encompassed by the First Amendment always have been viewed as fundamental components of the liberty safeguarded by the Due Process Clause." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 780 (1978). "[T]he freedom to loiter for innocent purposes is" also "part of the 'liberty' protected by the Due Process Clause." *City of Chicago v. Morales*, 527 U.S. 41, 53 (1999) (plurality opinion). The Constitution likewise guarantees the "fundamental right of free movement" to both adults and minors. *See Nunez ex rel. Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997) (invalidating a juvenile curfew ordinance under strict scrutiny review). The Order places a heavy burden on the exercise of these protected liberty interests.[16]

---

[16] Our task at the first prong of the procedural due process analysis is to determine whether "there exists a liberty or property interest which has been *interfered* with by the State," *see Juvenile Male*, 670 F.3d at 1013

As noted, the Order prohibits anyone subject to its terms from associating with any other enjoined parties — including family members — in "any public place, any place accessible to the public, or in public view" in the Safety Zone. The "Do Not Associate" prohibition extends to "stand[ing], sit[ting], walk[ing], driv[ing], bicycl[ing]," or "gather[ing] or appear[ing]." The Order also establishes curfews for both minors and adults, prohibiting nighttime presence in a "public place, vacant lot, or business establishment" unless an enumerated exception applies. These provisions directly interfere with an individual's "fundamental right of free movement," *id*., and an "individual's decision to remain in a public place of his choice," *Morales*, 527 U.S. at 54. Related terms of the Order that bar "remain[ing] in the presence" of other individuals engaged in various acts — such as possessing firearms or drinking alcohol — further affect these same liberty interests. Those terms restrict freedom of movement and use of public places because of the actions of others, over which one may have no control, and do so without regard to whether the individual engaging in the banned activities is an OVC gang member.

The Do Not Associate provision and other limitations on association have no exception for individuals to engage in First-Amendment protected "expressive" activity, such as attending religious services, participating in political demonstrations, or otherwise "associat[ing] with others in

---

(emphasis added), not whether the Order substantially violates the constitutional protections accorded such interests. The Order's terms are thus relevant here only insofar as they implicate the constitutionally protected liberty interests of those subject to the injunction, which feeds into our next inquiry, *see infra* Section IV.B, namely what, if any, *procedural* protections the Due Process Clause requires Orange provide before subjecting individuals such as Plaintiffs to the Order's terms.

pursuit of [the] wide variety of political, social, economic, educational, religious, and cultural ends" "protected by the First Amendment." *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). The same provisions also burden the constitutionally protected freedom of "intimate association," *see id.* at 618, by barring association with family members in public places such as schools, churches, parks, libraries, stores, and restaurants (and in some instances, at home), if in "public view," *see supra* n.5.

The "Do Not Use Gang Hand Signs or Symbols" provision, in turn, restricts freedom of expression by banning the "use[ or] display . . . by means of any words, phrases, physical gestures, hand signs, or symbols" that an enjoined party "know[s] describe[s], represent[s], or refer[s] to the" OVC gang, or "remain[ing] in the presence" of individuals using such words or gestures.[17] This proscription would, for example, ban a covered individual from referring to the OVC gang, or listening to someone else refer to the OVC gang, in the designated locations, while discussing this lawsuit or the state court Order. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (noting that "[c]ontent-based regulations are presumptively invalid" under the First Amendment); *McCoy v. Stewart*, 282 F.3d 626, 633 (9th Cir. 2002). Also possibly affecting freedom of expression is the prohibition on wearing orange clothing and clothing that "feature[s] . . . the . . . word[] 'Orange.'" *Cf. Sammartano v. First Judicial Dist. Court, in & for Cnty. of Carson City*, 303 F.3d 959, 966 (9th Cir. 2002).

---

[17] The district court also found that "individuals use the term 'OVC' to refer to the historical Cypress Street Barrio located within the Safety Zone, and thus use of the term 'OVC' may not be an indication of gang membership."

In sum, a host of the Order's terms implicate constitutionally protected liberty interests.

Aside from the terms of the Order itself, Orange's actions subjecting Plaintiffs to the Order also constitute further "interfere[nce]" with liberty interests triggering scrutiny under the Due Process Clause. *See Juvenile Male*, 670 F.3d at 1013. Although the Order did not name Plaintiffs individually, Orange subjected Plaintiffs to the Order; notified Plaintiffs they could face "*CRIMINAL PROSECUTION*" for violating the Order's terms; and testified in this litigation to a "policy [of] arrest[ing], transport[ing], and book[ing] those Plaintiffs alleged to have violated the Order and hold[ing] them pending bond or arraignment, rather than citing and releasing them," as well as a "policy of seeking increased bail amounts for violations of the Order." OPD and OCDA's policy gave Plaintiffs a choice between refraining from a wide variety of otherwise lawful, constitutionally protected activities, or going to jail, quite possibly for some time.

Based on the evidence presented at trial, the district court found that some Plaintiffs have in fact refrained from exercising their rights, particularly their "right of free movement." *See Nunez*, 114 F.3d at 944. Plaintiff Vasquez, "who has lived his entire life in the Safety Zone, has curtailed going to parks, stores, restaurants, and the mall, for fear of being arrested." Vasquez "no longer goes anywhere in the injunction area with his brother, with whom he lives and who has also been served with the Order." Plaintiff Lara "no longer goes with his family," including his "twin brother, who also has been served with the Order," "to their favorite restaurants, to the local pool where Mr. Lara learned to swim, to parks where the family previously picnicked, or to the City

of Orange's annual street fair."  The remaining named Plaintiffs — the Bastida brothers — no longer "drive through the injunction area together or visit family together, or attend family functions that are held outdoors, for fear of violating the Order."  "When their grandfather had a stroke and was taken to a hospital in the Safety Zone in the middle of the night, their mother was forced to decide whether to permit the brothers to visit the publicly accessible hospital, an act that would violate both the curfew and association provisions of the Order."

The district court similarly found that Plaintiff Lara used to "participate[] in vigils, demonstrations, and protests within the injunction area, but ceased doing so after being served with the Order, for fear he would be violating its terms by confronting and challenging government policies and associating with individuals on the injunction list."  "Such persons include [his] twin brother, who also has been served with the Order."  The Bastida Plaintiffs likewise "refrained from participating in protests . . . out of fear of violating the Order[]."[18]

Because Orange's unilateral decision to restrict Plaintiffs' constitutionally protected liberty interests constituted an "interfere[nce] . . . by the State," *see Juvenile Male*, 670 F.3d at 1013, we turn to an examination of whether Orange was obligated to provide Plaintiffs with additional procedural protections.

---

[18] We have reviewed the record and determined that none of the district court's findings of fact, including these, is clearly erroneous.  *See Hinkson*, 585 F.3d at 1262.

## B.

*Mathews v. Eldridge*, 424 U.S. 319 (1976), provides the familiar framework for the second step of our analysis, namely "whether the procedures attendant upon [Orange's] deprivation" of Plaintiffs' liberty interests "were constitutionally sufficient." *See Juvenile Male*, 670 F.3d at 1013. *Mathews* "directs us to examine:"

> first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Brittain v. Hansen*, 451 F.3d 982, 1000 (9th Cir. 2006) (quoting *Mathews*, 424 U.S. at 334–35). In "balancing" the *Mathews* factors, we are mindful that "the requirements of due process are 'flexible and call for such procedural protections as the particular situation demands.'" *Wilkinson v. Austin*, 545 U.S. 209, 224–25 (2005) (quoting *Morrisey v. Brewer*, 408 U.S. 471, 481 (1972)).

The district court correctly determined that the *Mathews* factors "weigh clearly in favor" of the conclusion that Orange violated Plaintiffs' procedural due process rights by failing to provide any form of hearing before subjecting them to the Order.

**1.**  It follows from our analysis of Plaintiffs' liberty interests in Section IV.A that Plaintiffs' "private interest[s]" are very strong.  *See Brittain*, 451 F.3d at 1000.  The scope of conduct covered by the Order is wide, intruding considerably on the daily lives of those subject to it.  As the district court found after personally touring the Safety Zone, the geographical area covered by the Order encompasses "dense residential areas," "several schools," "at least four parks," "the Chapman University campus and its surroundings," "the historic downtown Orange Area . . . which includes a vibrant commercial district," "government buildings and offices (including Orange City Hall, the police station, and the public library)," "a hospital," and "hundreds of retail and commercial business, and hundreds of homes and apartments."  As the district court also correctly noted, for "individuals who have spent much of their lives living in and around the area," the Order's terms "impose[] significant restrictions on Plaintiffs' liberty interests."

Moreover, that the Order is permanent — it lacks an "expiration . . . or sunset date,"— compounds the deprivation.  "[T]he possible length of wrongful deprivation . . . is an important factor in assessing the impact of official action on the private interests."  *See Mathews*, 424 U.S. at 341.

In sum, under the first *Mathews* factor, Plaintiffs' interests are truly weighty.[19]

---

[19] Orange is mistaken that the interests of "the residents of Orange who are constantly plagued by the activities of the OVC" are assessed under the "private interests" factor.  The interests of the public, for whom OCDA advocates in its capacity as a representative of the People of California, are instead considered under the third *Mathews* prong, which addresses the "Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater

**2.** Under California law, "[f]or the purposes of a gang abatement injunction," "an active gang member is a person who participates in or acts in concert with" a gang, where "[t]he participation . . . [is] more than nominal, passive, inactive, or purely technical." *People v. Englebrecht*, 88 Cal. App. 4th 1236, 1258, 1261 (2001); *see Broderick Boys*, 149 Cal. App. 4th at 1517. California courts have held that under state law, the state has the burden of demonstrating active gang membership by "clear and convincing evidence," rather than a lower "preponderance" standard, given "the importance of the interests affected by [such an] injunction." *Englebrecht*, 88 Cal. App. 4th at 1256; *see Broderick Boys*, 149 Cal. App. 4th at 1517.

In applying the second *Mathews* factor, we address the fact-intensive nature of assessing whether an individual is an active gang member or participant; the adequacy of the procedures Orange used in making that determination; the value of additional procedural safeguards; and the sufficiency of post-deprivation remedies. *Mathews*, 424 U.S. at 335.

**(a)** Where a factual issue "depend[s] on [the] credibility of witnesses and assessment of conditions not subject to measurement," and is not "susceptible of reasonably precise measurement by external standards," "[t]he risk of error is considerable when such determinations are made after hearing only one side." *Chalkboard, Inc. v. Brandt*, 902 F.2d 1375, 1381 (9th Cir. 1989). Determining whether an

---

process." *See Hamdi v. Rumsfeld*, 542 U.S. 507, 529–30 (2004) (plurality opinion) (quoting *Mathews*, 424 U.S. at 335) (declining to consider under the first *Mathews* prong an "immediate threat to the national security of the United States"); *Mathews*, 424 U.S. at 347 (noting that the third factor includes "societal costs" to providing pre-deprivation hearings).

individual is an active gang member presents a considerable risk of error.  The informal structure of gangs, the often fleeting nature of gang membership, and the lack of objective criteria in making the assessment all heighten the need for careful factfinding.

Gangs are often "loose knit[ and] without structure." Att'y Gen.'s Youth Gang Task Force, Dept. of Justice of the State of California, *Report on Youth Gang Violence in California* 3 (1981).  The STEP Act so recognizes, codifying a definition of "criminal street gang" that includes groups "whether formal or informal."  Cal. Penal Code § 186.22(f).[20]

For our part, we have recognized that many "[g]angs . . . do not have by-laws, organizational minutes, or any other normal means of identification."  *United States v. Hankey*, 203 F.3d 1160, 1169–70 (9th Cir. 2000).  California courts have also so noted.  *People v. Valdez*, 58 Cal. App. 4th 494

---

[20] Other states' definitions of a "gang" for criminal and other purposes are similar in reaching informal groups. *See, e.g.*, Ariz. Rev. Stat. Ann. § 13-105 ("formal or informal"); Colo. Rev. Stat. Ann. § 18-23-101(1) (same); Del. Code Ann. tit. 11, § 616(a)(1) (same); Fla. Stat. Ann. § 874.03(1) (same); Ga. Code Ann. § 16-15-3(2) (same); Idaho Code Ann. § 18-8502(1) (same); Iowa Code Ann. § 723A.1(2) (same); Kan. Stat. Ann. § 21-6313(a) (same); La. Rev. Stat. Ann. § 15:1404(A) (same); Minn. Stat. § 609.229(1) (same); Mo. Rev. Stat. § 578.421(1) (same); Mont. Code Ann. § 45-8-402(1) (same); Nev. Stat. § 193.168(8) ("combination of persons, organized formally or informally"); N.C. Gen. Stat. § 14-50.16(b) ("formal or informal"); N.D. Cent. Code § 12.1-06.2-01(3) (same); Ohio Rev. Code Ann. § 2923.41(A) (same); S.C. Code Ann. § 16-8-230(2) (same); S.D. Codified Laws § 22-10A-1(1) (same); Tenn. Code Ann. § 40-35-121(a)(1) (same); Utah Code Ann. § 76-9-802 ("group . . . operated formally or informally"); Va. Code Ann. § 18.2-46.1 ("formal or informal"); Wash. Rev. Code § 9.94A.030(12) (same); Wis. Stat. § 939.22(9) (same).

(1997), for example, concluded that many "gangs are not public and open organizations or associations like the YMCA or State Bar association, which have a clearly defined and ascertainable membership.  Rather, gangs are more secretive, loosely defined associations of people, whose involvement runs the gamut from 'wannabes' to leaders. . . . [D]etermining whether someone is involved and the level of involvement is not a simple matter . . . ." *Id.* at 506–07.  Likewise, *Colonia Chiques* noted that the gang there at issue had a membership that was "continually changing," with "[n]ew members . . . joining the gang, [and] . . . old members . . . leaving it or becoming inactive."  156 Cal. App. 4th at 41.[21]

At trial, Plaintiffs' two expert witnesses, James Vigil, professor of criminology at University of California, Irvine, and Malcolm Klein, professor of sociology at the University of Southern California, testified to these same fluid characteristics of gangs in general and OVC in particular.  Both reported that "most gang members" eventually leave gangs, making it difficult to determine membership or participation at any single time based on a past report of an individual's involvement in a gang.  Klein also stated that OVC, based in a particular neighborhood in the City of

---

[21] Social science literature confirms the fluid and often fleeting nature of gang membership.  Most juveniles belong to gangs for "1 year or less." Chris Melde et al., *Identifying Correlates of Stable Gang Membership*, 28 J. Contemp. Crim. Just. 482, 483 (2012); *see also* James C. Holwell, *Menacing or Mimicking? Realities of Youth Gangs*, 58 Juv. & Fam. Ct. J. 39, 44 (Spring 2007) ("Studies in numerous localities show that more than half of young gang members stay in the gang for less than a year."); *see also* Report on Youth Gang Violence in California 5 ("[M]embers . . . move in and out of the gang on the basis of their interest in gang functions.").

Orange, was "one of the less cohesive gangs" which he had encountered in more than forty years studying gangs.

Based on the trial record, including the expert evidence, the district court determined that whether "an individual is an active participant of a criminal street gang is" a "multi-factored, complex[,] and fact specific" inquiry. The district court also found that OVC membership would be "particularly difficult to determine . . . because gang members and nonmembers often grow up together in the same neighborhood and have social relationships and friendships unrelated to the gang." Distinguishing an individual's social association with a gang member on a familial or friendship — i.e. non-gang related — basis, from an association with the gang as an organization is therefore a nuanced task. The district court also noted, based on Professor Vigil's testimony, that many "individuals who have grown up in the local neighborhood or who have family members in the gang may be deemed members of the gang without undergoing any kind of initiation." It is therefore often unclear, the district court found, at what point a "person becomes a member or participant of a gang." In light of the evidence before the district court, its findings regarding the "multi-factored, complex[,] and fact specific" nature of determining whether someone is an OVC gang member are not clearly erroneous. *See Hinkson*, 585 F.3d at 1262.

Moreover, the fact that the police observe an individual violate one of the Order's terms is of little probative value in assessing whether that individual is in fact an OVC gang member. The Order prohibits a wide variety of otherwise legal, quotidian conduct not directly correlated with the nuisance and criminal activities that gave rise to the Order. Much of the behavior covered by the Order can occur outside

the presence of any other individual even putatively covered by the Order.

In short, given the "wide variety of information [that] may be deemed relevant," and the difficulty of "reasonably precise measurement" in assessing whether someone is an active gang member, "[t]he risk of error is considerable when such [a] determination[ is] made" without any participation by, or opportunity to provide evidence on behalf of, the individual served with the Order and, according to Orange, putatively covered by it. *See Mathews*, 424 U.S. at 343; *Chalkboard*, 902 F.2d at 1381.

**(b)** As to the procedures actually used to determine which individuals would be served with the Order and considered subject to it, the district court characterized those procedures as follows: "Defendants undertook a unilateral, fact-intensive determination, based on one-sided and untested evidence and requiring judgmental questions not determined by objective measures." This characterization is well supported by the record.

Testimony by Deputy District Attorney Michael Hernandez, Assistant District Attorney John Anderson, Joel Nigro, and Aaron Drootin, established that Orange lacked clear standards for determining on whom to serve the Order. As the district court found, Hernandez, Nigro, and Drootin "repeatedly testified that they . . . had no fixed list or set criteria to determine whether an individual was an active participant of OVC." Throughout trial, these witnesses noted that there was no "equation" to determine gang membership; no "bright line rule"; and "every situation can be different." Their testimony indicates that OPD used inconsistent standards. Nigro, for instance, explained that OCDA did not

provide OPD with an "explanation as to" the meaning of "active participant." He believed, based on his "conversations with gang participants . . . [and] police officers and detectives" that "association can be enough for a person to be an active participant" of a gang. Detective Drootin, in contrast, testified that merely knowing an OVC member was insufficient to establish membership.

Orange argues on appeal that the Superior Court made adequate findings at the preliminary injunction stage regarding gang membership, and that the decision as to which individuals to treat as bound by the Order was based on those findings. The district court, as noted, concluded otherwise — that Orange carried out a "unilateral determination." The district court's determination was not "illogical, implausible, or without support in inferences that may be drawn from the record." *See Hinkson*, 585 F.3d at 1262.

First, the state court never made any findings of gang membership regarding juveniles who lacked a guardian ad litem. The state court denied a preliminary injunction as to those individuals, but Orange later served them with the Order nonetheless.

Second, Orange served the Order on a number of plaintiff class members as to whom the state court denied a preliminary injunction. Although Orange maintains that it had new evidence of gang membership not submitted to the state court as to all but one of these individuals, that representation only emphasizes that Orange's coverage decisions were not determined by whether there had been a previous judicial indication as to coverage.

Finally, and most important, for those Plaintiffs as to whom the state court did make preliminary findings of gang membership, those findings were exactly what they purported to be — preliminary, not final. Such a preliminary finding "does not amount to an adjudication of the ultimate" issue, *see Cont'l Baking Co. v. Katz*, 68 Cal. 2d 512, 528 (1968), namely whether there was "clear and convincing evidence" as to Plaintiffs' status as active gang members, *see Englebrecht*, 88 Cal. App. 4th at 1256. There was ample testimony before the district court that some of the evidence of gang membership submitted to the district court was of questionable reliability. By dismissing them from the state court proceedings, OCDA deprived the Plaintiffs of an opportunity to take discovery from OCDA and the OPD officers who had submitted declarations in support of a permanent injunction against individual Plaintiffs. Determination of the ultimate accuracy of the state court's preliminary findings was therefore — through no fault of the state court — entirely undermined by the very procedural tactic that gave rise to this lawsuit.

**(c)** "[I]n certain circumstances, a state can cure what would otherwise be an unconstitutional deprivation of 'life, liberty or property' by providing adequate postdeprivation remedies." *Zimmerman v. City of Oakland*, 255 F.3d 734, 737 (9th Cir. 2001). Assuming, without deciding, that the deprivation of liberty interests that Plaintiffs have suffered could conceivably have been remedied by some form of post-deprivation procedure, we conclude that Orange has provided no such adequate process.[22]

---

[22] We proceed in this fashion because the parties have not briefed whether the "deprivations of liberty" at issue here fall into the "limited circumstances" in which "[p]ostdeprivation procedures may provide

Orange contends that Plaintiffs had several opportunities to obtain relief once it provided notice of its intent to enforce the Order against them: (1) through a "removal process" administered by OCDA; (2) by intervening in the Superior Court proceedings, *see Colonia Chiques*, 156 Cal. App. 4th at 35–37, 42; Cal. Civ. Proc. Code § 387; (3) by moving to modify or dissolve the Order, *see* Cal. Civ. Proc. Code § 533, and appealing from any order denying such a motion, *see* Cal. Civ. Proc. Code § 904.1(a)(6); *Iraheta v. Superior Court*, 70 Cal. App. 4th 1500, 1514 n.6 (1999), or appealing from the grant of the Order, *see id.*; or (4) in criminal contempt proceedings if arrested for violating the Order. We address each possibility in turn.

**(i)** According to Orange, under OCDA's self-designed "removal process," a panel of two Senior Deputy District Attorneys from OCDA and a Probation Department representative may review an individual's request to be removed from the ambit of the Order. This process is insufficient to provide an adequate post-deprivation remedy, for at least two reasons.

---

adequate due process." *See Albright v. Oliver*, 510 U.S. 266, 315 n.37 (1994) (Stevens, J., dissenting); *Zinermon v. Burch*, 494 U.S. 113, 132 (1990) (noting that "in situations where a predeprivation hearing is unduly burdensome in proportion to the liberty interest at stake . . . postdeprivation remedies may satisfy due process"); *Bailey v. Pataki*, 708 F.3d 391, 405 (2d Cir. 2013) (quoting *Zinermon*, 494 U.S. at 132) ("[W]here the State feasibly can provide a predeprivation hearing . . . it generally must do so regardless of the adequacy of a postdeprivation . . . remedy."); *Zimmerman*, 255 F.3d at 738 (holding postdeprivation remedies inadequate where a state officer "acted pursuant to some established procedure," as opposed to in "random, unpredictable, and unauthorized ways").

First, the district court did not clearly err in finding that "the precise nature of the process and the potential relief it offers remain unclear." As the district court found, the only written information that exists concerning the procedure is a single-page document served on the named defendants at the outset of the Superior Court case.[23] Orange acknowledged at trial that the exclusion process "had never been implemented with regard to OVC or any of the five other injunctions the OCDA had obtained." Moreover, there is no indication in the record that Plaintiffs were again given notice of the removal process when they were served with the Order. As Plaintiffs

---

[23] The notice served at the outset of the Superior Court case read: "Any defendant who has been named in and served with this lawsuit which seeks an injunction or subject to an injunction resulting from this lawsuit who believes he or she was erroneously included in the lawsuit or injunction may petition the [OCDA]'s Office for removal from the lawsuit or injunction. Upon notice from the defendant the [OCDA]'s office will hold a hearing to be presided over by a panel of two Senior Deputy District Attorneys not associated with the injunction action, and a representative from the Probation Department. At the hearing, the defendant may present evidence, if he or she chooses, to show that the defendant was never, or at present is not, an active participant in the named criminal street gang. The [OCDA] may present evidence to the contrary if there is any. If the panel determines by a preponderance of the evidence that the defendant was never, or at present is not, an active participant in the named criminal street gang, the [OCDA] will petition the assigned court to dismiss the defendant from the lawsuit or remove the defendant from the injunction. The findings of the hearing will be kept confidential. If a defendant is dismissed from the lawsuit or removed from the injunction pursuant to this provision and is subsequently found to be engaging in behavior indicative of active participation in a criminal street gang, then that defendant may be re-served with any injunction that results from this lawsuit and will be required to comply with all of its terms. This provision does not prevent the defendant from petitioning the assigned court at any time, to be dismissed from the lawsuit or removed from any injunction obtained as a result of the lawsuit, or exercising any other legal or equitable rights or remedies."

were dismissed from the Superior Court case and were not named in the resulting Order, it is not clear that the putative removal procedure applied to them.

Second, the removal process described suffers from essentially the same defects as the procedures Orange used unilaterally to determine against which nonparties to the state court lawsuit to enforce the Order. Most critically, the burden is on the petitioning individual to demonstrate that he or she is *not* an active gang participant, even though the State ordinarily has the burden of demonstrating active gang participation by "clear and convincing evidence." *Englebrecht*, 88 Cal. App. 4th at 1256. No enunciated criteria govern the determination who is or is not a gang member even though, as discussed earlier, *see supra* Section IV.B.2(a), membership is a shifting and sometimes nebulous standard. Furthermore, there are no provisions requiring an explanation of the basis for the conclusion that the individual is a gang member, either before or at the hearing. So the alleged gang member is left in a factual vacuum, to prove a negative. *Cf. Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1069 (1995) (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170 (1951) (Frankfurter, J., concurring)) ("[F]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights.").

**(ii)** Orange relies on *Colonia Chiques* for the proposition that Plaintiffs — as non-parties to the Superior Court case once dismissed — could have moved under California Code of Civil Procedure § 387 to intervene in that action on behalf of OVC. *See Colonia Chiques*, 156 Cal. App. 4th at 35–37, 42. Intervention in the state case is an inadequate post-deprivation remedy.

OCDA unilaterally dismissed Plaintiffs from the state case. The suggestion that Plaintiffs should have moved to intervene in an action from which they had just been dismissed has little merit. Having been dropped from the litigation, the Plaintiffs had no obligation to come back a second time to assert their interest in the matters at issue; their interest was evident, but they were excluded from the litigation precisely because of that. We stress once again, in this connection, that the procedural due process problems raised in this case are of Orange's own creation. They stem from Orange's decision to thwart Plaintiffs' efforts to use the procedures available in the state court that — all parties agree — were constitutionally sufficient.

Moreover, there is no indication that Plaintiffs could have intervened as a matter of right. OCDA would undoubtedly have opposed any intervention motion, as it had just dismissed the Plaintiffs as unnecessary to the action. The Superior Court could have denied an opposed intervention motion. *See* Cal. Civ. Proc. Code § 387; *City of Malibu v. California Coastal Comm'n*, 128 Cal. App. 4th 897, 902 (2005). It would have little choice but to do so with regard to the class of unrepresented juveniles; those individuals remained without a guardian ad litem, and the Superior Court had already declined to appoint guardians for them. Cal. Civ. Proc. Code § 372. As to the rest of the plaintiff class, the contingent right to file an opposed motion to intervene, subject to discretionary denial, is not an adequate assurance of due process to meet constitutional standards.

**(iii)** A motion to modify or dissolve the Order is an inadequate post-deprivation procedure because Plaintiffs take no issue with the terms of the Order itself. Plaintiffs' quarrel is only with Orange's decision, without any judicial or

administrative proceeding, to subject Plaintiffs to the Order. For the same reason, it is no answer to say that Plaintiffs could appeal from the denial of a motion to modify or dissolve the Order, or could appeal from the grant of the Order. Their contention is unrelated to any action of the Superior Court with regard to the Order.

*Broderick Boys* is not to the contrary. There, the court held that "without having to admit membership in the gang," four men were "sufficiently aggrieved by" an anti-gang injunction that they had standing to move to set aside the injunction. 149 Cal. App. 4th at 1518. *Broderick Boys* establishes that Plaintiffs could have challenged the terms of the Order in state court, or, as in *Broderick Boys*, argued that the Order in its entirety was void for lack of proper notice. But nothing in *Broderick Boys* suggests that Plaintiffs could have litigated in state court the question presented in their federal action — namely, *assuming* the validity of the Order, whether the Order could be enforced *against them*.

**(iv)** Finally, post-arrest criminal contempt proceedings would not be adequate to provide "full relief" from the deprivation of being subjected to the Order. *See Mathews*, 424 U.S. at 331.

In California, "[c]ontempt . . . may be punished in two ways": in a civil proceeding, for which the maximum penalty is a fine and five days imprisonment, *see* Cal. Civ. Proc. Code §§ 1209, 1218, or in a criminal misdemeanor proceeding, *see* Cal. Penal Code §§ 166(a)(4), (10),[24] for which the maximum

---

[24] California Penal Code § 166(a)(4) criminalizes the "[w]illful disobedience of the terms as written of any process or court order." Section 166(a)(10) criminalizes the "[w]illful disobedience of the terms

penalty is six months imprisonment. *See People v. Gonzalez*, 12 Cal. 4th 804, 816 (1996). At trial, Orange testified to a policy of prosecuting violations of the Order under the latter provision, and of "arrest[ing], transport[ing,] and book[ing] [any individual] alleged to have violated the Order and hold[ing] them pending bond or arraignment."

OCDA representatives also specified that OCDA has a policy of seeking "increase[d] bail" for violations of the Order, "to ensure that bail would be higher than it might otherwise be for a misdemeanor offense." A person charged under the criminal contempt provision may spend up to thirty days in jail between arraignment and trial under California's speedy trial statute. Cal. Penal Code § 1382(a)(3). Under Orange's policy for enforcing the Order, then, Plaintiffs can expect to face considerable difficulties posting bail and will likely be forced to spend up to a month in jail *before* obtaining the opportunity to contest their gang membership in a contempt proceeding.

As noted, the Order binds OVC's "members, agents, servants, employees," or "persons acting under, in concert with, for the benefit of, at the direction of, or in association with" OVC. In that wording, the Order is not unlike many abortion buffer zone or labor picketing injunctions. *See, e.g.*, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 759 n.1 (1994) (order directed at anti-abortion organizations); *In re Berry*, 68 Cal. 2d 137, 141–42 (1968) (anti-picketing injunction). What is unique, however, is the combination of Orange's enforcement policy — including the avowed policy of immediate arrest and a request for heightened bail — and

---

of an injunction that restrains the activities of a criminal street gang or any of its members."

the breadth and nature of the Order. Again, the Order proscribes a broad range of basic, daily activities by OVC's members, and it proscribes such conduct without regard to whether the individual is engaged in that conduct in concert with, as a member or agent of, or with the intent to further the purposes of the gang.

In these respects, this case differs from other contexts in which an injunction runs against an organization and its members, and, we shall assume for present purposes, unnamed members are accorded sufficient process through the opportunity to defend criminal contempt accusations. The abortion and labor cases, for example, involve injunctions restricting a narrow range of conduct — *e.g.*, demonstrating in a certain location or with a certain object. Engaging in those activities is likely to be highly correlated with whether an individual is in fact a member of the enjoined organization, which had engaged in similar activities. In contrast, the Order prohibits an enormous range of quotidian conduct that, on its face, is not indicative of an individual's gang membership, or any other connection to the enjoined gang.

Moreover, the difference in the scope of the injunctions in these various contexts is relevant because "[t]he more important the interest" affected by state action, "and the greater the effect of its impairment, the greater the procedural safeguards the state must provide to satisfy due process." *Haygood v. Younger*, 769 F.2d 1350, 1355–56 (9th Cir. 1985). Further, the lack of an inherent correlation between the enjoined activities and membership in the group covered by the Order exacerbates the already significant risk of error in identifying accurately the members of OVC.

Under the particular circumstances of this case, then, including the Order's pervasive interference with Plaintiffs' liberty interests and the lack of adequate pre-deprivation procedural safeguards, post-arrest contempt proceedings are insufficient to "cure . . . [the] unconstitutional deprivation of" liberty, including jail time, that would occur before a criminal contempt trial would be held.  *See Zimmerman*, 255 F.3d at 737.

**3.**  At the final stage of the *Mathews* inquiry, we consider "the Government's interest" "in providing (or not providing) specific procedures," "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *See Mathews*, 424 U.S. at 335; *Haygood*, 769 F.2d at 1356.  Here, "the operative question is not whether [Orange] has a significant interest in [combating gang violence] — no one doubts that [they] do[] — but rather whether [they] ha[ve] a significant interest in" failing to provide a pre-deprivation process through which an individual can challenge Orange's allegations of his active gang membership.  *Humphries v. Cnty. of L.A.*, 554 F.3d 1170, 1194 (9th Cir. 2008), *rev'd on other grounds*, 131 S. Ct. 447 (2010).

As the district court noted, Orange presented *no* evidence of "an administrative, fiscal or other substantial burden[] in providing . . . pre-deprivation safeguards."  In fact, OCDA Assistant District Attorney Anderson testified at trial that it was "standard procedure" in the five other state court proceedings in which OCDA previously sought anti-gang injunctions to name each defendant individually in the initial filing.  Moreover, at the time OCDA chose to dismiss Plaintiffs from the Superior Court proceedings, OCDA had obtained preliminary injunctions against OVC as an entity,

thereby satisfying any government interest in promptly obtaining relief against OVC itself.

Additionally, the record indicates that at least two jurisdictions in California — San Francisco and Oakland — regularly provide some form of pre-deprivation process for individuals in anti-gang injunction proceedings, rather than simply seeking injunctions against the gang as an entity and its unnamed members. We need not decide whether these jurisdictions' procedures are constitutionally required as a matter of due process; we simply cite them as examples of procedures, in addition to the procedures OCDA followed in cases prior to this one, that cast further doubt on Orange's claimed administrative burden in providing pre-deprivation protections of some kind.

There is no evidence in the record that further pre-deprivation procedures would reduce the efficacy of the injunction against OVC and its members. Orange's expert testified that he had "no opinion on whether providing a hearing before subjecting somebody to an injunction would make a gang injunction more or less effective."[25]

In sum, the district court properly concluded that Orange established no "administrative, fiscal or other substantial

---

[25] Moreover, the governmental interests that have historically supported the enforcement of injunctions against nonparties to the underlying litigation do not exist here. *See, e.g.*, *Nat'l Spiritual Assembly of the Bahá'ís of the U.S. of Am. Under the Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of the Bahá'ís of the U.S. of Am., Inc.*, 628 F.3d 837, 848–49 (7th Cir. 2010) (allowing enforcement of an injunction against nonparties who "aid[] or abet[] an enjoined party in violating an injunction" — or are "in 'privity' with[,]" "successors in interest to[,]" or are "otherwise 'legally identified' with the enjoined party").

burden[] in providing" some procedure for Plaintiffs to challenge Orange's gang membership determination before they were subjected to the terms of the Order. *See Mathews*, 424 U.S. at 335; *Haygood*, 769 F.2d at 1356.

**4.** All the *Mathews* factors, taken together, weigh decisively in favor of Plaintiffs. The scope of the Order is extraordinarily broad, interfering with a wide swath of Plaintiffs' protected liberty interests, including: family and social relationships; educational and professional opportunities; freedom of movement; and all manner of participation in civic life. Given the fact-intensive nature of assessing gang membership, Orange's procedures posed an unacceptably high risk of error. Additional procedural safeguards would have been of considerable value. In light of the significant private interests at stake, the proffered post-deprivation remedies, to the extent they were even available, were insufficient to provide Plaintiffs with full relief. Finally, Orange has not established any governmental interest justifying the failure to provide some measure of additional procedural safeguards before subjecting Plaintiffs to the Order. Given these considerations, the district court correctly concluded that Orange violated Plaintiffs' rights under the Due Process Clause of the federal Constitution.

Orange raised no challenge to the district court's entry of an injunction other than to dispute the district court's application of the *Mathews* factors. We therefore affirm the district court's issuance of declaratory and injunctive relief in Plaintiffs' favor.[26]

---

[26] OPD does not separately challenge Plaintiffs' entitlement to an injunction under the due process clause of the California Constitution — which provides greater procedural due process rights for private parties

**V.**

For the first time in their reply brief, Orange argues that the district court injunction does not "describe in reasonable detail . . . the act or acts restrained or required." Because we do not consider issues raised for the first time in reply briefs, we deem this late-raised argument forfeited. *See Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990).

We nonetheless provide some brief comments regarding our interpretation of the relatively terse federal court injunction, so as to guide the parties in any further proceedings. The district court's injunction states simply that Orange is "barr[ed]" "from enforcing the Order against the Plaintiffs," without providing any further indication of what actions, if any, Orange may take to enforce the Order while remaining in compliance with the federal injunction.

At oral argument in this court, Plaintiffs represented that under their interpretation of the federal injunction, Orange remains free to take any of the following actions without facing liability for contempt: First, Orange may enforce the Order against any alleged members of OVC who are not

---

than does the federal Constitution. *See Today's Fresh Start, Inc. v. L.A. Cnty. Office of Educ.*, 57 Cal. 4th 197 (2013). We therefore affirm the district court's grant of equitable relief against OPD on Plaintiffs' state law claim as well.

OPD does dispute the district court's separate determination that OPD conspired with OCDA to violate Plaintiffs' constitutional rights. We need not and do not reach this argument. The district court also concluded that OPD was "liable individually" for violating Plaintiffs' due process rights under the federal and California constitutions, and OPD does not contest that independent basis for its liability.

members of the Plaintiff class. Second, Orange is free to
return to the Superior Court to move to add any members of
the plaintiff class as named parties to the existing Order. If
Orange is successful in convincing the Superior Court by
"clear and convincing evidence" that a Plaintiff is an active
gang member, *see Englebrecht*, 88 Cal. App. 4th at 1256, any
resulting state-court order would supersede the current Order,
and the federal injunction would not bar enforcement of such
a new order. Third, Orange could propose to the district court
a plan for modifying the injunction and allowing enforcement
of the Order against Plaintiffs, contingent on affording
additional pre-enforcement procedural protections, such as a
robust, neutral administrative process. The district court
could then determine whether the proposed procedure cures
the current constitutional deficiencies. *See, e.g.*, *Brown v.
Plata*, 131 S. Ct. 1910, 1946 (2011) (noting that "[t]he power
of a court of equity to modify a decree of injunctive relief is
long-established, broad, and flexible").

Orange has not disputed Plaintiffs' reasonable
interpretation of the federal injunction. We agree with the
proffered interpretation, and with the understanding that if
Orange proposes a procedure constitutionally sufficient to
determine which members of the Plaintiff class are members
of OVC against whom the Order may be enforced, the district
court will consider modifying the injunction.[27]

---

[27] If an appropriate motion is made, it may be useful for the district court
to set up a process for the parties to propose and comment on possible
alternative procedures. *See, e.g.*, *Armstrong v. Davis*, 275 F.3d 849, 883
(9th Cir. 2001) (Berzon, J., concurring) (describing the district court's
issuance of "an umbrella injunction," followed by district court oversight
of the parties' "directed negotiation process" aimed at "develop[ing]
specific policies and procedures" for complying with the broad
injunction).

## VI.

Throughout the extensive district court proceedings, including litigation of a motion for a preliminary injunction, cross-motions for summary judgment, and an eleven-day bench trial, counsel for Plaintiffs incurred more than 5900 hours in billable hours. As prevailing parties under 42 U.S.C. § 1988, Plaintiffs ultimately obtained an award of $3,237,249 in attorney's fees. On appeal, Orange challenges the fee award in only a single respect: it asserts error in the district court's finding that "no special circumstances" made a fee award "unjust." Orange asserts as special circumstances both its "good faith," and its powerlessness to "issue" the Order and to "ignore" it once "signed." We review the district court's award of attorney's fees for abuse of discretion. *Mendez v. Cnty. of San Bernardino*, 540 F.3d 1109, 1124 (9th Cir. 2008).

The "special circumstances" exception to an award of attorney's fees to a prevailing party under 42 U.S.C. § 1988 "applies only in unusual cases." *Id*. at 1126. "'[A] court's discretion to deny fees under § 1988 is very narrow and . . . fee awards should be the rule rather than the exception.'" *Barnard v. Theobald*, 721 F.3d 1069, 1077 (9th Cir. 2013) (quoting *Mendez*, 540 F.3d at 1126). "The defendant has the burden of showing [that] special circumstances warrant a denial of fees, and the defendant's showing must be a strong one." *Herrington v. Cnty. of Sonoma*, 883 F.2d 739, 744 (9th Cir. 1989) (internal citations omitted). To determine whether such circumstances exist, we evaluate "whether (1) allowing attorney's fees would further the purposes of § 1988, and (2) whether the balance of equities favors or disfavors the denial of fees." *Mendez*, 540 F.3d at 1126 (internal quotation marks omitted).

The first factor is clearly satisfied. The fee award "further[ed] the statutory purpose of § 1988[, namely] to enable private citizens who could otherwise not afford to vindicate their civil rights to do so." *Herrington*, 883 F.2d at 743 (internal quotation marks omitted). Given the lack of precedents regarding the due process protections required in circumstances such as these, there was no "strong likelihood of success on the merits . . . at the outset of the litigation." *See Mendez*, 540 F.3d at 1126. Nor, given the fact that Plaintiffs sought only equitable relief, was there "a strong likelihood of a substantial judgment" from which Plaintiffs' counsel could anticipate obtaining compensation. *See id.*

With regard to the "balance of equities" factor, we find no support in our caselaw for the proposition that Orange's "good faith" and its powerlessness to "issue" or "ignore" the Order qualify as special circumstances precluding the few award.

First, a "defendant's good faith belief that it was following the law does not," at least "by itself," "qualify as a 'special circumstance.'" *See Saint John's Organic Farm v. Gem Cnty. Mosquito Abatement Dist.*, 574 F.3d 1054, 1064 (9th Cir. 2009) (quoting *Teitelbaum v. Sorenson*, 648 F.2d 1248, 1250 (9th Cir. 1981) (per curiam)).

Second, Orange's contention that it "obvious[ly] . . . had no power to issue the [Order] itself, and [it] certainly had no discretion to ignore the [Order] once it was signed" rests on the same erroneous interpretation of the Order we have already rejected. The Order did not, by its terms, require Orange to enforce it against the Plaintiffs or anyone else, much less require them to do so without the procedural protections due under the federal and California

constitutions.**[28]**  Instead, it was Orange that determined to cut short Plaintiffs' access to a fully adequate adjudicatory forum by dismissing them from the state court lawsuit once they sought actively to present a defense.

## CONCLUSION

We are mindful of the great importance of controlling the proliferation of criminal gangs and preventing illegal activity by gang members.  Anti-gang injunctions such as the one at issue here broadly restrict the covered individuals' legal daily activities in a prophylactic effort to prevent illegal activities from taking place.  There is no challenge before us as to the propriety of that effort as applied to properly covered individuals, and we express no view whatsoever on the substantive terms of this or any other anti-gang injunction. But the breadth of the injunction, given its prophylactic character, does give rise to unusually strong liberty interests on the part of those putatively covered.

In light of those interests, *some* adequate process to determine membership in the covered class is constitutionally required.  Had Orange not dismissed the Plaintiffs from the state court lawsuit, that process would have been provided.

---

**[28]** Because Defendant Rackauckas is not subject to equitable remedies for violations of state law in this case, *see supra* Section III, it is possible that there is some difference in the amount of the fee award (which included a state-law multiplier) that can be applied to him.  We leave it to the district court in the first instance to determine whether there is in fact some portion of the fee award for which Defendant Rackauckas is not responsible.

Because Orange engineered that dismissal, there cannot be enforcement against these plaintiffs without some alternative adequate process. That is all we decide today, nothing more.

Defendants shall bear the costs on appeal.

**AFFIRMED in part, REVERSED in part, and REMANDED**.

Exhibit A



ORIGINAL

PLTS/DFTS EXHIBIT # 19
DATE OF: Hernandez
PG: 18    52410

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAY 14 2009

ALAN CARLSON, Clerk of the Court

BY M. VARELA

SUPERIOR COURT OF CALIFORNIA

FOR THE COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

RECEIVED
SUPERIOR COURT OF ORANGE
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER
MAY 12 2009

THE PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff,

v.

ORANGE VARRIO CYPRESS CRIMINAL STREET GANG (an unincorporated association), STEVE ABAD (aka Steven Abad), IVAN ABAD (aka Ivan Doctor Abad, Shadey, Shady), ALEXANDER CISNEROS AGUIRRE (aka Alex Garcia, Alejandro Aguirre, Alex Aguirre, Alex Cisneros Aguirre, Pablo Gonzales, Cartoon), JOE ANTHONY ALVARADO (aka Philip Estrada, Joseph Alvarado, Felipe DeJesus Estrada, Joe, Stranger), MIGUEL ALVIDREZ (aka Miguel Aolvidrez, Sleeper, Sleepy), MONIQUE AMBER ALVARADO, WILLIAM ARANDA (aka William Chavez Aranda, Willie Aranda, William Chavez Aranda, William Chavez, Willy Chavez Aranda, William Aranda Jr., William Chavez Aranda Jr., Casper), ERIKA VANESSA ARANDA (aka Erika Mariscal Aranda, Erika Vanessa Arando, Erika Vanessa Miranda, Gumby, Ms. Smokey), RAYMOND MARTIN ATENCIO (aka Ray Atencio, Raymond Martin Attencio, Reymond

Case No. 30-2009-00118739

[PROPOSED] ORDER FOR
PERMANENT INJUNCTION

CASE NO.   SACV09-1090 VBF (RNBx)

Manuel Vasquez, et al

VS.   Tony Rackauckas, et al

PLAINTIFF'S EXHIBIT   19

DATE _____ IDEN.

DATE _____ EVID.

BY _____
Deputy Clerk

AO 386

1

[Proposed] Order for Permanent Injunction

19

01642

EXHIBIT 19  PAGE 1

Martin Atencio, Rey Atencio, Reymond Martin Atencio, IV, Raymond Martin Atencio, IV, Raymond Atencio, Ray Ray, Rey Rey, Demon), JESUS JOSE AVILA (aka Jesus Avila, Jesus Avila Gonzalez, Chewy), JAVIER AVILA (aka Jesus Avila, Javier Avila Gonzalez, Javi, Javy, Smokey), JOSE AYALA (aka Jose Ayala, Jr., Shadow), JOSEPH ANTHONY BAEZ (aka Joseph Anthony Bael, Spooky, Spooks, Spookster), RANDY BASTIDA (aka Randy William Bastida), GABRIEL BASTIDA (aka Gabriel Nasario Bastida), JUAN BENITEZ, JR. (aka Juan), WILLIAM RYAN BOOKER (aka Ryan Booker, Stalker), JOSHUA ALLAN BRANCH (aka Josh Allen Branch, Joshua Branch, Joshua A. Branch, Joshua Allen Branch, Cricket), ANDREW CALDERON (aka Andrew Michael Calderon, Kid), BRIAN JAVIER CAMACHO, JAVIER CAMACHO (aka Brian Gutierrez, Laughing Boy), LAURO CAMPOS (aka Laura Campos, Lauro Campos, Lauro Campos-Rosas, Goofy, Midnight), JESUS COMRA CANO (aka Jesus Cano Correa, Jesus Cantu Correa, Chewee, Chewy, Chuy), CELERINO CARBAJAL (aka Whisper), ANGEL ANTHONY CERVANTES (aka Playboy), ENRIQUE OCHOA CERVANTES (aka Ricky Cervantes, Soldier Ricky), RENE RAYMOND CHAVEZ (aka Indio), ANNA SILVIA COOPER (aka Ana Silvia Nogales, Anna Silvia Nogales, Ms. Shaggy), MICHAEL GALBRAITH COOPER (aka Michael Galbrith, Mike Cooper, Michael Ortiz, Michael Cooper, Jesse Soto, Cartoon, Shaggy, Smokey), MARTIN SALVADOR CORNEJO (aka Lil Martin, Rabbit), RUBEN CANDILLARIA CRUZ (aka Reuben Cruz, Ruben Cruz, Ruben Candellarria Cruz, Pirate), MIGUEL ALAHONDRO CRUZ, LOUIS MIGUEL DEHERRERA (aka Louie, Tiger), ROY DAVID DEHERRERA (aka Patrick Phillip DeHerrera, Pat DeHerrera, Patrick Philip DeHerrea, Patric Philip DeHerrera, Patrick Philip Herra, P. Herrera, Roy DeHerrera, Patrick DeHerrera, Patrick Phillip Herrera, Patrick P.

2

[Proposed] Order for Permanent Injunction

EXHIBIT 19 PAGE 2

01643

001597

DeHerrera, Patrick Philip Herrera) ,PATRICK PHILIP DEHERRERA (aka Patrick Phillip DeHerceba, Patarick Philip DeHerrea, Popeye), HECTOR DELATORRE JR. (aka Hector Junior Delatorre, Matthew Montoya, Scrap, Scraps, Skrap), JAVIER ESPARZA (aka John David Esparz, Gizmo), HUGO ADRIAN ESTEVES (aka Blaze), CHRISTIAN MOISES GALINDO (aka Christian Msoses Galindo, Cristian Moises Galindo, Christian Mmoises Galindo, Anthony Perez, Edgar Galindo), ANDREW PAUL GARCIA (aka Andrew Garcia, Youngster, Wacko), JAVIER HUGO GARCIA (aka Negro), JOEL JOSEPH GARCIA (aka Joseph F. Garcia, Joseph Franklin Garcia), MIGUEL ANGEL GARCIA (aka Bunny, Rabbit), RICHARD ANTHONY GARCIA (aka Richard Garcia, Shorty, Little Richard, Rich, Valarta), RONNIE ANDREW GARCIA (aka Ronnie Guillermo Garcia, Evil, Run Run), EDUARDO GOMEZ (aka Eddie Gomez, Eddie, Eddy, Trip, Trips), ALEX GONZALEZ (aka Alex Gonzales, Alejandro Gonzalez, Lil Hitman), EMMANUAL GOMEZ (aka Gustavo Gomez, Manny, Pelon), JOSEPH MICHAEL GONZALEZ, JR. (aka Joe Michael Gonzales, Joseph Michael Gonzales, Joe Gonzales, Joseph M. Gonzales, Joseph Gonzales, Joseph Michael Gonzalez, Joseph Gonzalez, Joe Gonzalez, Shanker), JUAN LUIS GONZALEZ (aka Abel Pico Martinez, Lazy), JASON ROBERT GRAY (aka Demon, Jay), CHARLES RICHARD GREEN (aka Charles Green, Richard Green, Charles Richard Rojas, Richard Charles Rojas, Charles Fitchorp Green, Richard C. Green, Droopy, Green Eyes), JOSE DEJESUS GUZMAN (aka Jose DeJesus Guzman Macias, Jesus Guzman, Jose DeJesus Macias), ANTHONY CHRISTOPHER HART (aka Anthony C. Hart, Anthony Christophe Hart, Sucio), ALBERT ANTHONY HERNANDEZ (aka Albert Hernandez, Jr., Lil Shaggs, Lil Shaggy, Pee Wee), LORI ALEJANDRA HUERTA (aka Lady Wicked), JAVIER GREGORY HURTADO (aka Gregoric

3

[Proposed] Order for Permanent Injunction

EXHIBIT 19 PAGE 3

01644

001598

Javier Hurtado, Javier Gregorio Hurtado, Jr., Lil Evil, Javy, Little Evil), JESSE BERNAL LARA (aka Jesse Lara, Joker), MIGUEL BERNAL LARA (aka Wicked Lara, Boxer, Wicked), DANIEL EMANUAL LOPEZ (aka Daniel Emanuel Lopez, Daniel Emanual Lopez, Daniel Emanoal Lopez, Daniel Lopez, Little Man, Travieso), JONATHAN MICHAEL LOPEZ (aka Jonathan Lopez, Johnathan Michael Lopez, Charles Michael Lopez, Jonthon Michael Lopez, Jonathan Michael Lopez, Johnny, Before, Polm, Sparky), JOSE ANTONIO LORENZO (aka Pooh), ANGEL LUNA (aka Angel Sevilla Luna), CARLOS MARTINEZ MAGANA (aka Carlos Magana Martinez, Mr. Goofy), ANTHONY PEREZ MARTINEZ (aka Anthony Martinez, Hector Martinez, Anthony Eliff, Anthony P. Martinez, Anthony Perez Martinez, Jr.),EDGAR EDUARDO MARTINEZ (aka Rascal), JOSE ANTONIO MARTINEZ (aka Tony Martinez, Tony), JOSE CARLOS MAYORGA (aka Doeboy, Dough Boy, Doughbboy, Joe), HARVEY MEJIA (aka Chucky, Gardo), MELISSA NICHOLE MEJIA (aka Melisa Nichol Mejia, Melisa Nicole Mejia, Nicole Gonzales, Melisa Saucedo, Melissa Saucedo, Boo Boo), ADRIAN MENDOZA (aka Mr. Sparkey, Sparky), ENRIQUE CAMACHO MERAZ (aka Enrique Merez, Gangster, Gremlin, Lil OG, Lil Shortce, O.G. Original), MICHAEL ALBERTO MORALES, JAIME MIGUEL MORGUTIA, JR. (aka Jaime Morgutia, Jaime Morgutia, Jr., Jaime M. Morgutia, Jaime Miguel Morgutia), JOSE DANIEL MUNOZ (aka Jose Munoz, Goody, Innocent, Lil Good, Lil Goody, Lil Trips), ANGELA LAURA NAVARRO (aka Angie L. Navarro, Angeie Navarro, Angel Laura Navarro, Angie, Big Angie, Grumpy, La Grumpy), GILBERT NEGRETE (aka Gilberto Negrete, Wolfy), JOSE ADAN NIETO (aka Clumsy), OMAR PATINO (aka Lil Man), DANIEL NEFTALI PEREZ (aka Daniel Nafala Perez, Daniel Nefaly Perez), GUSTAVO ALFONSO PEREZ (aka Gustavo Perez, Cartoon), DIEGO RAMIREZ (aka

4

[Proposed] Order for Permanent Injunction

EXHIBIT 19 PAGE 4

01645

001599

Diego Benitez Ramirez, Diego Javier Ramirez), JUAN SERGIO RAMIREZ (aka Juan Ramirez, Juan Carlos Ramirez, Boxer), NATHANIEL RYAN RAMIREZ (aka Nathanial Ryan Ramirez, Nathaniel Ramirez, Minor), ROMIE DANIEL PEREZ (aka Oso, Slow, Slow Boy), ZACHARIAH ISAIAH RAMIREZ (aka Zacharia Isiah Rameriz, Boxer), ROBERT LOUIS REIL (aka Robert Luis Reil, Robert Luis Riel, Robert Louis Riel, Robert Reil, Shanke, Luis, Downer), HOMER LUIS ROSALES (aka Homer Alvarez, Luis Rosalez Alvarez, Luis Rosales Castro, Homer Alvarez Rosales, Luis Rosales, Luis Homer Alvarez Rosales, Homer, Maze), TYRONE CHRISTOPHER RYE (aka Troy Rye, William Rye, Tyrone Christophe Rye, William Norman Rye, Norman Rye William, Michael Mitchell Veramondi, Richard A. Portillo, Richard Aaron Portillo, Thumper), CARLOS MANUEL SANCHEZ (aka Carlos Perez, Carlos Sanchez Perez, Lost), LUIS ALBERTO SANCHEZ (aka Cheeks, Kashetez, Cochetes), SHAWN SANDOVAL (aka Shawny Boy), JESSE SAUCEDO (aka Big Jesse, Scarp), BEATRICE DESIREE SEPULVEDA (aka Desiree Sepulveda, Dee Dee, Desiree), ADAM WAYNE SNELL (aka Adam Wyane Snell, Bones, Casper), BRIAN JOHN SUAREZ (aka Brian Hugo Suarez, Dough Boy), FERNANDO TAPIA (aka Fernando Saul Tapia, Fernie, Panther), ISRAEL TEJEDA (aka Israel Tejeda, Jr., Clever, J., Shorty), CLARENCE ANTHONY TENORIO (aka Clarence Tenorio, Tony Tenorio, Clarence Valdivai, Clarence Anthony Valdivia – Tenorio, Clever, Klever), RUBEN TENORIO (aka Ruben Palacios), DANNY BOY TORRES (aka Baby Boy, Danny Boy, Demon, Lil Demon, Little Demon), HERMES GERARDO TROCHEZ (aka Hermes Geraldo Trochez, Hermas Tarochez, Hermes Torchez, Hermes Tarochez, Herman Gerardo Trochez, Sleep, Psyco, Syko), MARTIN BLANCO TRUJILLO (aka Martin Trujillo, Jose Soto, Bugsy, Crook, Rhino), DANIEL VASQUEZ (aka Danny Vasquez), DAVID VICTOR

5

{Proposed} Order for Permanent Injunction

01646

EXHIBIT 19  PAGE 5

VASQUEZ (aka Victor David Vasquez, David Vasquez, Herbie, Sneaky), MANUEL VASQUEZ, NATHANIEL VALDEZ (aka Nathaniel Valdez Arriano, Nathaniel Joseph Valdez, Leva, Nate, Nate Dogg, Punk), SERGIO VASQUEZ (aka Sergio Gonzalez), JESUS ANTONIO VELASQUEZ (aka Frog, Frogger, Froggy, Maniac, Groggy), YONI VELASQUEZ (aka Yony Velasquez, Clown), RAYMUNDO VELEZ (aka Raymundo Rivas Velez, Artic, Artik, Joker, Klone), JEFFREY SEBASTIAN VILLALBA (aka Jeffrey Villalba, Shy Boy, Shy One), ALFONSO MEJIA YEPEZ (aka Alfonso Majayepez, Alfonso Yepez, Alfonso Clemente Reyes, Alfonso Mejia – Yepez, Alfonzo Yepez Mejia), ALEXIS FERNANDO ZAMORA (aka Alex Zamora, Rocky, Rookie, 4), EDGAR MIGUEL ZAMORA (aka Edgar Zamora, Edgar M. Zamora, Chief, Dopey, Doppy), and DOES 1 – 150, inclusive,

Defendants.

GOOD CAUSE HAVING BEEN SHOWN, IT IS HEREBY ORDERED ORANGE VARRIO CYPRESS CRIMINAL STREET GANG (an unincorporated association), and the ORANGE VARRIO CYPRESS CRIMINAL STREET GANG'S members, participants, agents, associates, servants, employees, aiders, and abettors whose membership, participation, agency, association, service, employment, aid, or abetment is more than nominal, passive, inactive, or purely technical, and all persons acting under, in concert with, for the benefit of, at the direction of, or in association with ORANGE VARRIO CYPRESS CRIMINAL STREET GANG in a manner that is more than nominal, passive, inactive, or purely technical, and Miguel Alvidrez (aka Miguel Aolvidrez, Sleeper, Sleepy), Raymond Martin Atencio (aka Ray Atencio, Raymond Martin Attencio, Reymond Martin Atencio, Rey Atencio, Reymond Martin Atencio, IV, Raymond Martin Atencio, IV, Raymond Atencio, Ray Ray, Rey Rey, Demon), Jose Ayala (aka Jose Ayala, Jr., Shadow), Joseph Anthony Bacz (aka Joseph Anthony Bael, Spooky, Spooks,

6

[Proposed] Order for Permanent Injunction

Spookster), Gabriel Bastida (aka Gabriel Nasario Bastida), Joshua Allan Branch (aka Josh Allen Branch, Joshua Branch, Joshua A. Branch, Joshua Allen Branch, Cricket), Lauro Campos (aka Laura Campos, Lauro Cumpos, Lauro Campos-Rosas, Goofy, Midnight), Jesus Comea Cano (aka Jesus Cano Correa, Jesus Cantu Correa, Chewee, Chewy, Chuy), Rene Raymond Chavez (aka Indio), Martin Salvador Cornejo (aka Lil Martin, Rabbit), Ruben Candillaria Cruz (aka Reuben Cruz, Ruben Cruz, Ruben Candellarria Cruz, Pirate), Javier Esparza (aka John David Esparz, Gizmo), Ronnie Andrew Garcia (aka Ronnie Guillermo Garcia, Evil, Run Run), Andrew Paul Garcia (aka Andrew Garcia, Youngster, Wacko), Richard Anthony Garcia (aka Richard Garcia, Shorty, Little Richard, Rich, Valarta), Alex Gonzalez (aka Alex Gonzales, Alejandro Gonzalez, Lil Hitman), Juan Luis Gonzalez (aka Abel Pico Martinez, Lazy), Jason Robert Gray (aka Demon, Jay), Charles Richard Green (aka Charles Green, Richard Green, Charles Richard Rojas, Richard Charles Rojas, Charles Fitchorp Green, Richard C. Green, Droopy, Green Eyes), Jose DeJesus Guzman (aka Jose DeJesus Guzman Macias, Jesus Guzman, Jose DeJesus Macias), Javier Gregory Hurtado (aka Gregorio Javier Hurtado, Javier Gregorio Hurtado, Jr., Lil Evil, Javy, Little Evil), Jesse Bernal Lara (aka Wicked Lara, Joker), Jonathan Michael Lopez (aka Jonathan Lopez, Johnathan Michael Lopez, Charles Michael Lopez, Jonthon Michael Lopez, Jonathan Michael Lopez, Johnny, Before, Polm, Sparky), Jose Carlos Mayorga (aka Doeboy, Dough Boy, Doughboy, Joe), Harvey Mejia (aka Chucky, Gardo), Adrian Mendoza (aka Mr. Sparkey, Sparky), Enrique Camacho Meraz (aka Enrique Merez, Gangster, Gremlin, Lil OG, Lil Shortee, O.G. Original), Jaime Miguel Morgutia, Jr. (aka Jaime Morgutia, Jaime Morgutia, Jr., Jaime M. Morgutia, Jaime Miguel Morgutia), Omar Patino (aka Lil Man), Juan Sergio Ramirez (aka Juan Ramirez, Juan Carlos Ramirez, Boxer), Zachariah Isaiah Ramirez (aka Zacharia Isiah Rameriz, Boxer), Diego Ramirez (aka Diego Benitez Ramirez, Diego Javier Ramirez), Nathaniel Ryan Ramirez (aka Nathanial Ryan Ramirez, Nathaniel Ramirez, Minor), Robert Louis Reil (aka Robert Luis Reil, Robert Luis Riel, Robert Louis Riel, Robert Reil, Shanke, Luis, Downer), Tyrone Christopher Rye (aka Troy Rye, William Rye, Tyrone Christophe Rye, William Norman Rye, Norman Rye William, Michael Mitchell Veramondi, Richard A. Portillo, Richard Aaron Portillo, Thumper), Carlos Manuel Sanchez (aka

7

[Proposed] Order for Permanent Injunction

01648

EXHIBIT 19 PAGE 7

001602

Carlos Perez, Carlos Sanchez Perez, Lost), Shawn Sandoval (aka Shawny Boy), Clarence Anthony Tenorio (aka Clarence Tenorio, Tony Tenorio, Clarence Valdivai, Clarence Anthony Valdivia – Tenorio, Clever, Klever), Yoni Velasquez (aka Yony Velasquez, Clown), Alexis Fernando Zamora (aka Alex Zamora, Rocky, Rookie, 4), Edgar Miguel Zamora (aka Edgar Zamora, Edgar M. Zamora, Chief, Dopey, Doppy), Danny Boy Torres (aka Baby Boy, Danny Boy, Demon, Lil Demon, Little Demon), Martin Blanco Trujillo (aka Martin Trujillo, Jose Soto, Bugsy, Crook, Rhino) are enjoined from engaging in or performing directly or indirectly, any of the following activities in the Safety Zone:

The Safety Zone is defined as follows:

## I. DOWNTOWN TERRITORY

The north curb-line of Collins Avenue; to the west curb-line of Glassell Street; to the north curb-line of Jacaranda Avenue; to the east curb-line of Grand Street: to the north curb-line of Collins Avenue; to the west curb-line of Cambridge Street; to the north curb-line of Adams Avenue; to the east curb-line of California Street; to the north curb-line of Collins Avenue; to the east curb-line of Cambridge Street; to the south curb-line of La Veta Avenue; to the east curb-line of Shaffer Street, continuing along the wrought iron fence-line that boarders the eastern perimeter of Hart Park; to the cinder-block wall that surrounds Hart Park; to the west curb-line of Glassell; to the south curb-line of La Veta; to the west curb-line of Crest Street; to the west curb-line of Feldner Street; to the south curb-line of Chapman Avenue; to the west curb-line of Eckhoff Street; to the south fence-line located to the rear of the businesses at 2100-2200 W. Orangewood; to the east curb-line of the Orangewood off-ramp of the northbound 57 freeway; to the north curb-line of Orangewood Avenue; to the west curb-line of Main Street; to the north curb-line of Collins Avenue.

## II. HIGHLAND TERRITORY:

(Area 1) The north curb-line of Lincoln Avenue to the north, the south curb-line of Meats Avenue to the south, the west sound-barrier wall of the south-bound 55 Freeway to the east, and the west curb-line of Canal Street to the west; (Area 2) The north curb-line of Meats Avenue to

8

[Proposed] Order for Permanent Injunction

01649

EXHIBIT 19 PAGE 8

001603

the north, the fence-line located behind the businesses at 1592 North Tustin Street to the south, the west sound-barrier wall of the south-bound 55 Freeway to the east, the cinderblock wall located behind the businesses on Tustin Street to the west; (Area 3) The fence-line located behind the businesses at 1592 North Tustin Street to the north, the south curb-line of Katella Avenue to the south, the west sound-barrier wall of the south-bound 55 Freeway to the east, the fence-line located behind the businesses at 1400-1518 and 1582 North Tustin Street to the west; (Area 4) The cinder block wall located behind the businesses on the north-west corner of Tustin Street and Katella Avenue to the north and west, the north curb-line of Katella Avenue to the south, the west sound-barrier wall of the south-bound 55 Freeway to the east; (Area 5) The north curb-line of the Katella Avenue to the north, the south curb-line of Collins Avenue to the south, the west sound-barrier wall of the south-bound 55 Freeway to the east, the east curb-line of California Street to the west; (Area 6) The north curb-line of Collins Avenue to the north, the south curb-line of Mayfair Avenue to the south, the west sound-barrier wall of the southbound 55 Freeway to the east, the east curb-line of Shattuck Street to the west; (Area 7) The north curb-line of Mayfair Avenue to the north, the north curb-line of Walnut Avenue to the south, the west sound-barrier wall of the south-bound 55 Freeway to the east, the cinder block wall located behind the businesses on Tustin Street to the west; (Area 8) The north curb-line of Walnut Avenue to the north, the south curb-line of Palm Avenue to the south, the west sound-barrier wall of the south-bound 55 Freeway to the east, the east curb-line of Shattuck Street to the west; (Area 9) The north curb-line of Palm Avenue to the north, the north curb-line of Chapman Avenue to the south, the west sound-barrier wall of the south-bound 55 Freeway to the east, the cinder block wall locate behind the businesses on Tustin Street to the west; (Area 10) The north curb-line of Chapman Avenue to the north, the south curb-line of Palmyra Avenue to the south, the west sound-barrier wall of the south-bound 55 Freeway to the east, the east curb-line of Lincoln Street to the west.

III. HOOVER-WILSON TERRITORY:

The north curb-line of Katella Avenue to the north; the south curb-line of Collins Avenue to the south; the east curb-line of Glassell Street to the east; and the OCTA Metro-Link railroad tracks

9

[Proposed] Order for Permanent Injunction

01650

EXHIBIT 19   PAGE 9

to the west. (A map of the Safety Zone is attached hereto as Exhibit A.)

a. Do Not Associate: Anywhere in any public place, any place accessible to the public, or in public view, do not stand, sit, walk, drive, bicycle, gather or appear with (1) any person named herein, (2) anyone you know to be a member, participant, agent, associate, servant, employee, aider, or abettor of the Orange Varrio Cypress criminal street gang, or (3) anyone you know to be acting under, in concert with, for the benefit of, at the direction of, or in association with the Orange Varrio Cypress criminal street gang. (People ex rel. Gallo v. Acuna, supra, 14 Cal.4th at 1110, 1117-1118, 1121-1122 [discussion of provision (a)], 1123-1125; In re Englebrecht, supra, 67 Cal.App.4th at 488-489, 490 fn. 3 [quoting par (a)]; People v. Englebrecht, supra, 88 Cal.App.4th at 1243 and 1261; People ex. rel. Totten v. Colonia Chiques (2007) 156 Cal.App.4th 31, 37.)

b. Do Not Intimidate: Anywhere in any public place, any place accessible to the public, or in public view, do not (1) confront, intimidate, annoy, harass, threaten, challenge, provoke, assault, or batter anyone in the Safety Zone, or (2) remain in the presence of or assist anyone you know is confronting, intimidating, annoying, harassing, threatening, challenging, provoking, assaulting, or battering anyone in the Safety Zone. (People ex rel. Gallo v. Acuna, supra, 14 Cal.4th at 1118-1122; In re Englebrecht, supra, 67 Cal.App.4th at 490 fn. 3, 493, [par (k)]); People ex. rel. Totten v. Colonia Chiques, supra, 156 Cal.App.4th, 31, 37.)

c. Stay Away From Drugs and Drug Paraphernalia: Anywhere in any public place, any place accessible to the public, or in public view, do not (1) unlawfully use, possess, transport, furnish, manufacture, deliver, dispense, distribute, or sell any drug or drug paraphernalia, (2) remain in the presence of or assist anyone you know is unlawfully using, possessing, transporting, furnishing, manufacturing, delivering, dispensing, distributing, or selling any drug or drug paraphernalia, (3) remain in the presence of or assist anyone you know is unlawfully under the influence of any drug, (4) knowingly remain in the presence of any illegal drug or drug paraphernalia, or (5) unlawfully be under the influence of any drug. (Bus. & Prof. Code §§ 4060, 4140-4141; Health & Saf. Code §§ 11014, 11014.5, 11018-11021, 11053-

10
[Proposed] Order for Permanent Injunction

11058, 11364, and 11550; Pen. Code § 31; *People v. Englebrecht, supra,* 88 Cal.App.4th at 1243, fn. 2, [par (l)]); *People ex. rel. Totten v. Colonia Chiques, supra,* 156 Cal.App.4th, 31, 37.)

d. **Stay Away From Guns, Explosive Devices and Weapons:** Anywhere in any public place, any place accessible to the public, or in public view, do not (1) use, possess, transport, furnish, manufacture, deliver, dispense, distribute, or sell any firearm, gun, replica firearm, ammunition, BB gun, pellet gun, explosive device, destructive device, or weapon such as knives, dirks, daggers, clubs, metal knuckles, hard plastic knuckles, nunchakus, chains, slingshots, or any weapon listed in Penal Code § 12020, (2) remain in the presence of or assist anyone you know is using, possessing, transporting, furnishing, manufacturing, delivering, dispensing, distributing, or selling any firearm, gun, replica firearm, ammunition, BB gun, pellet gun, explosive device, destructive device, or weapon such as knives, dirks, daggers, clubs, metal knuckles, hard plastic knuckles, nunchakus, chains, slingshots, or any weapon listed in Penal Code § 12020, or (3) knowingly remain in the presence of any firearm, gun, replica firearm, ammunition, BB gun, pellet gun, explosive device, destructive device, or weapon such as knives, dirks, daggers, clubs, metal knuckles, hard plastic knuckles, nunchakus, chains, slingshots, or any weapon listed in Penal Code § 12020. (Health & Saf. Code §§ 12000, 12120, 12303, and 12305; Pen. Code §§ 31, 12001, 12020, 12020.1, 12301, 12550; OMC §§ 9.32.010, 9.32.020; *People v. Englebrecht, supra,* 88 Cal.App.4th at 1243, fn. 2, [par (c), (j)]); *People ex. rel. Totten v. Colonia Chiques, supra,* 156 Cal.App.4th, 31, 37.)

e. **Do Not Fight:** Anywhere in any public place, any place accessible to the public, or in public view, do not (1) unlawfully fight or challenge another person to fight, (2) remain in the presence of or assist anyone you know is unlawfully fighting or challenging another person to fight, (3) maliciously and willfully disturb another person by loud or unreasonable noise, (4) remain in the presence of or assist anyone you know is maliciously and willfully disturbing another person by loud or unreasonable noise, (5) use offensive words which are inherently likely to provoke an immediate violent reaction, or (6) remain in the presence of or assist anyone you know is using offensive words which are inherently likely to provoke an immediate violent

11
[Proposed] Order for Permanent Injunction

reaction. (Pen. Code §§ 31 and 415; *People v. Englebrecht, supra,* 88 Cal.App.4th at 1243, fn. 2, [par (d)]); *People ex. rel. Totten v. Colonia Chiques, supra,* 156 Cal.App.4th, 31, 37.)

f. Do Not Trespass: Do not (1) be present on, remain on, or pass through any property not open to the public unless you have the voluntary consent of the owner, owner's agent, or the person in lawful possession of the property, or (2) remain in the presence of or assist anyone you know is present on any property not open to the public without the voluntary consent of the owner, owner's agent, or the person in lawful possession of the property. (*People v. Englebrecht, supra,* 88 Cal.App.4th at 1243, fn. 2, [par (g)]); *People ex. rel. Totten v. Colonia Chiques, supra,* 156 Cal.App.4th, 31, 37.)

g. Do Not Block Free Passage: Anywhere in any public place, any place accessible to the public, or in public view, do not (1) willfully and maliciously block the free passage of any person or vehicle on any street, walkway, sidewalk, driveway, alleyway, or other area of public passage, or (2) remain in the presence of or assist anyone you know is willfully and maliciously blocking the free passage of any person or vehicle on any street, walkway, sidewalk, driveway, alleyway, or other area of public passage. (Pen. Code §§ 31 and 647c; OMC § 12.64.020; *In re Englebrecht, supra,* 67 Cal.App.4th at 490 fn. 3, 493 [par (h)].)

h. Do Not Engage In Graffiti and/or Vandalism And Stay Away From Graffiti/Vandalism Tools: Anywhere in any public place, any place accessible to the public, or in public view, do not (1) maliciously spray paint, mark with marker pens, or otherwise deface property with graffiti or other inscribed material on any public property or private property not your own, (2) remain in the presence of or assist anyone you know is maliciously spray painting, marking with marker pens, or otherwise defacing property with graffiti or other inscribed material on any public or private property not belonging to him, her or you, (3) maliciously damage or destroy real or personal property not your own, (4) remain in the presence of or assist anyone you know is maliciously damaging or destroying real or personal property not belonging to him, her or you, (5) unlawfully possess spray paint cans, marker pens, knives, screwdrivers, razor blades, nails, or other objects capable of destroying, damaging, or defacing property, or (6) remain in the presence of or assist anyone you know is unlawfully possessing spray paint cans,

12

[Proposed] Order for Permanent Injunction

01653

EXHIBIT 19 PAGE 12

marker pens, knives, screwdrivers, razor blades, nails, or other objects capable of destroying, damaging, or defacing property. (Pen. Code §§ 31, 594, and 594.2; OMC §§ 8.37.030, 8.37.040 8.37.045; *People v. Englebrecht, supra,* 88 Cal.App.4th at 1243, fn. 2, [par (e), (f)]); *People ex. rel. Totten v. Colonia Chiques, supra,* 156 Cal.App.4th, 31, 37.)

i. **Do Not Use Gang Hand Signs or Symbols:** Anywhere in any public place, any place accessible to the public, or in public view, do not (1) use, display, or communicate by means of any words, phrases, physical gestures, hand signs, or symbols that you know describe, represent, or refer to the Orange Varrio Cypress criminal street gang, or (2) remain in the presence of or assist anyone you know is using, displaying, or communicating by means of any words, phrases, physical gestures, hand signs or symbols that you know describe, represent, or refer to the Orange Varrio Cypress criminal street gang. (*People v. Englebrecht, supra,* 88 Cal.App.4th at 1243 fn. 2, 1266-1267 [par (s)]); *People ex. rel. Totten v. Colonia Chiques, supra,* 156 Cal.App.4th, 31, 37.)

J. **Do Not Wear Gang Clothing:** Anywhere in any public place, any place accessible to the public, or in public view, do not (1) wear, display, exhibit, or possess any clothes or accessories that you know advertise, advance, promote, represent, or refer to the Orange Varrio Cypress criminal street gang, including clothes or accessories that display, exhibit, or feature, in any variation or combination, the image, name, words, or letters, "Orange Varrio Cypress," "Orange Varrio Cypress Street," "Cypress Street," "Cypress Street Killers," "Varrio Orange," "Varrio Cypress," "Orange Gang," "Old Towne Gang," "Old Towne Orange Gang," "Old Towne Orange," "Orange," "Cypress," "OVC," "OVECE," "Killer Park Gang," "Los Royal Dukes," "Dukes," "Royal Dukes," "Las Dukes," "Creepers," "Los Creepers," "13," "X3," "XIII," or clothes or accessories that display, exhibit, or feature the color orange, or (2) remain in the presence of or assist anyone that you know is wearing, displaying, exhibiting, or possessing any clothes or accessories that you know advertise, advance, promote, represent, or refer to the Orange Varrio Cypress criminal street gang. (*People v. Englebrecht, supra,* 88 Cal.App.4th at 1243 fn. 2, 1266-1267 [par (t)]); *People ex. rel. Totten v. Colonia Chiques, supra,* 156 Cal.App.4th, 31, 37.)

13

[Proposed] Order for Permanent Injunction

01654

EXHIBIT 19 PAGE 13

k. **Stay Away From Burglary Tools:** Anywhere in any public place, any place accessible to the public, or in public view, do not (1) unlawfully use, possess, transport, furnish, manufacture, deliver, dispense, distribute, or sell any screwdrivers, porcelain spark plug chips, shaved keys, picklocks, wire cutters, dent pullers, slingshots, steel shots, spark plugs, "slim jims," "bump key," or any instrument or tool listed in Penal Code § 466, or (2) remain in the presence of or assist anyone you know is unlawfully using, possessing, transporting, furnishing, manufacturing, delivering, dispensing, distributing, or selling any screwdrivers, porcelain spark plug chips, shaved keys, picklocks, wire cutters, dent pullers, slingshots, steel shots, spark plugs, "slim jims," "bump key," or any instrument or tool listed in Penal Code § 466. (Pen. Code § 466; *In re Englebrecht, supra,* 67 Cal.App.4th at 490 fn. 3, [par (o)]; *People v. Englebrecht, supra,* 88 Cal.App.4th at 1243 fn. 2 [par (n)].)

l. **Obey Curfew if You Are a Minor:** If you are under eighteen (18) years of age, anywhere in any public place, any place accessible to the public, or in public view, do not remain in or upon any public place, vacant lot, or business establishment between the hours of 10:00 p.m. on any day and 5:00 a.m. of the following day, unless: (1) you are accompanied by your parent(s), legal guardian, or by a responsible adult, (2) you are on an errand without any detour or stop at the direction of your parent(s), legal guardian or responsible adult, (3) you are on a public or private sidewalk in front of your own dwelling or a dwelling directly adjacent to your dwelling, (4) you are acting within the course and scope of your lawful employment or business or when you are going to or from such place of lawful employment or business by a reasonably direct route, without detour, from or to your home, or when you are going to or from a bona fide interview for lawful employment by a reasonably direct route, without detour, from or to your home, (5) you are going to or from, are attending, or are engaged in, an official school, official religious, or other expressive activity within the scope of your rights under the First Amendment to the Constitution of the United States which activity is supervised or overseen by an adult person on behalf of any public entity, civic organization, non-profit organization, educational organization, governmental organization, or similar organization, where you are going to or from such activity in a reasonably direct route, without detour, from

14

[Proposed] Order for Permanent Injunction

01655

EXHIBIT 19 PAGE 14

001609

or to your home, (6) you are going to or from a place of lawful entertainment, recreation, culture, or charity that is open to the public, such as a restaurant, theater, museum, church, sports arena, homeless shelter, food bank, library, public park during operating hours, gymnasium, bookstore, coffee shop, or hospital, for an activity that is supervised or overseen by an adult person on behalf of any public entity, civic organization, non-profit organization, educational organization, governmental organization, or similar organization, where you are going to or from such activity in a reasonably direct route, without detour, from or to your home, (7) you are a registered volunteer at any shelter, hospital, school or other charitable institution and you are going to or from your volunteer work in a reasonably direct route, without detour, from or to your home, (8) you are responding to an emergency situation, or (9) you are in a vehicle engaged in interstate travel. (OMC § 9.28.010; *In re Englebrecht, supra,* 67 Cal.App.3rd at 490 fn. 3, [par (x)]; *People v. Englebrecht, supra,* 88 Cal.App.4th at 1243 fn. 2, [par (v)]; *In re Nancy C.* (1972) 28 Cal.3rd 747; *Alves v. Superior Court* (1957) 148 Cal.App.2d. 419.)

m. **Obey Curfew If You Are an Adult:** If you are eighteen (18) years of age or older, anywhere in any public place, any place accessible to the public, or in public view, do not remain in or upon any public place, vacant lot, or business establishment between the hours of 10:00 p.m. on any day and 5:00 a.m. of the following day, unless: (1) you are on a public or private sidewalk in front of your own dwelling or a dwelling directly adjacent to your dwelling, (2) you are acting within the course and scope of your lawful employment or business, or when you are going to or from such place of lawful employment or business by a reasonably direct route, without detour, from or to your home or when you are going to or from your home for a bona fide interview for lawful employment by a reasonably direct route, without detour, from or to your home, (3) you are going to or from, are attending, or are engaged in, an official school, official religious, or other expressive activity within the scope of your rights under the First Amendment to the Constitution of the United States, where you are going to or from such activity in a reasonably direct route, without detour, from or to your home, (4) you are going to or from a place of lawful entertainment, recreation, culture, or charity that is open to the public, such as a restaurant, theater, museum, church, sports arena, homeless shelter, food bank, library,

15

[Proposed] Order for Permanent Injunction

01656

EXHIBIT 19  PAGE 15

001610

public park during operating hours, gymnasium, coffee shop, or hospital, where you are going to or from such place in a reasonably direct route, without detour, from or to your home, (5) you are a registered volunteer at any shelter, hospital, school or other charitable institution and you are going to or from your volunteer work in a reasonably direct route, without detour, from or to your home, (6) you are responding to an emergency situation, or (7) you are in a vehicle engaged in interstate travel. (OMC § 9.28.010; *In re Englebrecht, supra,* 67 Cal.App.3rd at 490 fn. 3, [par (x)]; *People v. Englebrecht, supra,* 88 Cal.App.4th at 1243 fn. 2, [par (v)]; *In re Nancy C.* (1972) 28 Cal.3rd 747; *Alves v. Superior Court* (1957) 148 Cal.App.2d. 419.)

n. Stay Away From Alcohol: Anywhere in any public place, or any place accessible to the public, do not (1) drink alcoholic beverages, (2) possess an open container of an alcoholic beverage, (3) unlawfully be under the influence of alcohol, (4) knowingly remain in the presence of anyone possessing an open container of an alcoholic beverage, or (5) knowingly remain in the presence of an open container of an alcoholic beverage. (Pen. Code § 647(f); Veh. Code §§ 21221.5, 23140, 23152(a); OMC §9.16.020; People ex. rel. *Totten v. Colonia Chiques, supra,* 156 Cal.App.4th p. 38-39); *People ex. rel. Totten v. Colonia Chiques, supra,* 156 Cal.App.4th, 31, 37.)

o. Do Not Act as a Lookout: Anywhere in any public place, any place accessible to the public, or in public view, do not keep watch, yell, whistle, signal, gesture, or otherwise act as a lookout to warn another person of the approach or presence of a law enforcement officer. (*People v. Engelbrecht, supra,* 88 Cal.App.4th 1236, 1243, fn. 2, [par (q)]; *In re Engelbrecht, supra,* 67 Cal.App.4th 486, 490, fn. 3, [par (r)]); *People ex. rel. Totten v. Colonia Chiques, supra,* 156 Cal.App.4th, 31, 37.)

p. Obey All Laws: Anywhere in any public place, any place accessible to the public, or in public view, obey all laws and court orders.

DATED: 5-14-09

Hon. Kazuharu Makino
Judge of the Superior Court

16
[Proposed] Order for Permanent Injunction

01657

EXHIBIT 19 PAGE 16

TALLMAN, Circuit Judge, concurring:

I concur in the opinion but write separately to more thoroughly describe the backdrop of the anti-gang injunction at issue and to reiterate why today's holding is confined to the unique procedural and factual record in this case.

My colleagues insist that they are "mindful of the great importance of controlling the proliferation of criminal gangs and preventing illegal activity by gang members." Maj. at 61. While I do not doubt their sincerity, they devote scant attention in an otherwise comprehensive opinion to explaining why the anti-gang injunction at issue was so vital to City of Orange residents and law enforcement. I write separately to fill that void.

The Orange Varrio Cypress street gang (OVC) is one of the most violent gangs in the City of Orange, California, a suburb of Los Angeles.[1] There is no serious dispute that the enterprise engages in on-going criminal activity involving attempted murders, assaults with deadly weapons, terrorist threats, intimidation of victims and witnesses, illegal possession of firearms, robberies, burglaries, thefts, drug sales, and acts of felony vandalism.

---

[1] In providing this overview of the OVC's activities, I draw primarily from the February 10, 2009, expert declaration submitted by Detective J. Nigro of the Orange Police Department in support of the anti-gang injunction. At the time of his declaration, Detective Nigro had been a sworn peace officer for 13 years, had served in the Orange Police Department's gang unit for six years, had investigated hundreds of gang-related cases, and had interviewed over 1,000 gang participants regarding their gangs, graffiti, tattoos, crimes, families, and gang culture.

These criminal activities frequently spill over into the community, hurting innocent people. OVC members have robbed and assaulted Chapman University students, beaten up a 13-year-old boy for whistling on his way home from school, and led police on high-speed chases through residential areas. Gang members have stabbed people in the head and back, shot others in the torso and neck, attacked people with bats and pipes, and hit, kicked, and threatened to kill female victims. The gang distributes drugs, using its members to both peddle and stand as lookouts to protect narcotic activity. They also deface community property by painting gang graffiti on buildings, sidewalks, doors, walls, and fences, and etching it into benches, street signs, and glass windows.

Even schools are not immune to the OVC's violence. The local high school unwillingly plays host to dozens of fights each year between members of the OVC and rival gangs. Still more concerning is that the OVC draws its membership from the pool of pupils attending the same high school, as well as a number of middle schools, to fill its ranks.

Unsurprisingly, many local residents have voiced their concern with the OVC to local law enforcement officers, demanding action to restore law and order to a city whose residents have good reason to fear the OVC's activities. Many of the complainants live in fear of OVC gang members, and are cautious about using their front yards or even being outside after dark. Still more complain about vandalism, gang graffiti, robberies, and assaults that take place where they live and work. Many citizens are also reluctant to cooperate with police for understandable fear of retaliation, which undoubtedly hinders police efforts to effectively curb gang violence through traditional criminal prosecution.

This is not to say that the OVC is the largest or most dangerous gang in California, or even in Orange County. But this case is emblematic of the legislature's declaration that California "is in a state of crisis . . . caused by violent street gangs whose members threaten, terrorize, and commit a multitude of crimes against the peaceful citizens of their neighborhoods." Cal. Penal Code § 186.21. It also provides much-needed context for why the Orange County District Attorney's Office and the Orange Police Department (collectively, Orange) sought and obtained a tough superior court injunction that, as my colleagues put it, "broadly restrict[ed] the covered individuals' legal daily activities in a prophylactic effort to prevent illegal activities from taking place." Maj. at 61.

In conducting our procedural due process analysis, we must take into account the government's and the public's interest. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (instructing us to consider "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail"). Orange undoubtedly has a vital interest in protecting its community by suppressing gang violence. But as the court observes correctly, our inquiry under this prong in *Mathews* is not whether Orange has a significant interest in combating gang violence, but rather whether it has a significant interest in failing to provide a pre-deprivation process to challenge Orange's gang membership allegations.

In my view, this inquiry cannot be severed from Orange's unsettling and indefensible decision to voluntarily dismiss every individual who tried to challenge the injunction in the state court proceeding, and then serve those same dismissed

individuals with the injunction it obtained uncontested. By its own admission, Orange adopted this strategy in part because of Plaintiffs-Appellees' "aggressive effort[s]" to "fight" the injunction.  Those efforts included several motions and supporting declarations opposing the entry of a preliminary injunction, written discovery requests, and a schedule of 20 depositions.  In effect, the district attorney concluded it was costing too much to litigate against well-financed defense lawyers.  Ironically, the taxpayers of Orange County now get to pick up a multi-million dollar tab for the litigation that ensued from the district attorney's bad tactical decision.  The type of "aggressive effort[s]" that Orange sought to sidestep come with the territory.  If Orange can rely on our judicial system to pursue its injunction, so too can those being targeted by the injunction who seek to resist it.

I thus share my colleagues' views that "the procedural due process problems raised in this case are of Orange's own creation" and that "[t]hey stem from Orange's decision to thwart Plaintiffs' efforts to use the procedures available in the state court[.]"  Maj. at 50.  Indeed, Orange's dismiss-and-serve strategy is the *linchpin* to its procedural due process violation because today's opinion applies only to those individuals whom Orange dismissed and later served.

We need not hold, and I do not read today's opinion as holding, that the post-deprivation procedural remedies that Orange proffered are constitutionally inadequate as to any other class of individuals.  Orange may well have a stronger argument under *Mathews*' governmental and public interest prong if today's challenge came from individuals who never appeared in the state court proceeding to contest the injunction and who are actually gang members.  But this is not the challenge before us.  And to stretch today's holding to

individuals who never challenged the injunction in the state court action—whether named in the lawsuit or not—would effectively force Orange to "bring a new action for injunctive relief against each new member" of the OVC. *See People ex rel. Totten v. Colonia Chiques*, 156 Cal. App. 4th 31, 41 (2007). Such a rule would dangerously impede law enforcement efforts to curb unlawful gang activity where "[gang] membership is continually changing." *See id*. Importantly, today's holding does not reach so far.

In sum, the ideal procedural protection to avoid being inadvertently included in a proposed injunction will often be to seek relief from a neutral judge before the injunction is entered. Orange's dismiss-and-serve tactic effectively stripped Plaintiffs-Appellees of that opportunity. That strategic maneuver—*when combined* with the post-deprivation procedural protections that Orange did provide—is what constituted a procedural due process violation of the United States Constitution.

With those observations, I concur in the opinion.